## Richmond.

NORFOLK AND WESTERN RAILWAY COMPANY v. F. L. AYLOR, TRADING AS CLARKE MILLING COMPANY.

November 14, 1929.

The opinion states the case.

*Weaver & Armstrong, J. O. Wiggs* and *James F. Wright*, for the plaintiff in error.

*Moore & Williams*, for the defendant in error.

PRENTIS, C. J., delivered the opinion of the court.

F. L. Aylor, trading as Clarke Milling Company, hereafter called the milling company, has recovered a judgment against the Norfolk and Western Railway Company, hereafter called the railway company, upon this state of facts:

The milling company, on August 27, 1925, consigned a carload of flour (100 barrels, packed in cotton bags, some containing ninety-six pounds, some forty-eight pounds, and the remainder twenty-four pounds per sack), to its own order from Berryville, Virginia, to Timmonsville, South Carolina, with directions to notify Rose & Rogers, of Timmonsville, S. C. The shipment was on the uniform bill of lading, prescribed by the Interstate Commerce Commission, and contained this provision: "The surrender of this original order bill of lading properly endorsed shall be required before the delivery of the property. Inspection of property covered by this bill of lading will not be permitted unless provided by law or unless permission is endorsed on this original bill of lading or given in writing by the shipper."

The defendant railway company was the initial carrier at Berryville, and the Seaboard Air Line Railway the delivering carrier at Timmonsville. The milling company, plaintiff, attached the bill of lading to a draft for $816.00, which covered the price of the flour and the freight charge, and deposited the draft with the bill of lading attached with the Berryville bank, by which it was forwarded to a bank at Timmonsville, S. C., with directions to notify Rose & Rogers upon arrival, it being understood that they would pay the draft and would accept and receive the bill of lading from the Timmonsville bank. While in the custody of the Seaboard between Durham, N. C., and Timmonsville, S. C., there was some damage to the original car, and at Raleigh the flour was transferred to another car in which it arrived at its destination. The local agent for the Seaboard at Timmonsville notified Rose & Rogers of its arrival September 9th. On the following day, September 10th, the draft being unpaid and held with the bill of lading by the bank, Rose of Rose & Rogers directed their drayman, McLeod, to unload the flour from the car and deliver it to their place of business. McLeod testified that Rose told him that Turner, the agent of the Seaboard, would point the car out to him; that he went there, saw the agent on the platform and told him that Rose & Rogers had a carload of flour there, and that Turner replied: "Yes; it is that red car there" (indicating), "and I said: 'Have you that seal number?' and he said: 'Yes,' " and he (Turner) went away checking up other cars in the yard; that Turner did not go to the car; that he (McLeod) went to the car, broke the seal and took a drayload of the flour to Rose & Rogers, who refused it and directed him to take it back and reload it on the car.

There is no specific contradiction of McLeod's testimony, no protest or objection to the drayman's action, but Turner denies that he assented to the delivery of the contents of the car. Afterwards Rose appears to have "borrowed" the bill of lading from the bank, but he did not surrender or offer to surrender it, did not pay the draft, but with Turner entered the car and inspected its contents.

. [1] The question as to whether Turner, as the agent of the railway company, acquiesced in and assented to the opening of the car and the unauthorized delivery of the flour was fairly submitted to the jury under proper instructions. We are of opinion that there can be no doubt about the correctness of the conclusion of the jury under the testimony, that when the agent of the railway company pointed out the specific car containing the flour to McLeod, the drayman, who came there to unload it, this constituted the delivery of the car and its contents, which was unlawful because done without requiring the delivery of the bill of lading.

We cannot agree that this was merely the delivery of the single drayload of the flour which the drayman removed from the car and afterwards returned. There may be a partial delivery of freight where it consists of separate articles, but when carload freight is placed upon a delivery track and a drayman is permitted to open it and commence unloading it, this is a delivery of the entire carload. If this delivery is wrongful, and upon such a bill of lading it is *prima facie* wrongful unless the original order bill of lading, properly endorsed, is first surrendered to the delivering carrier, then it is a conversion of the contents of the car.

The flour was refused by Rose & Rogers because, as

they claimed, it was damaged—chiefly because the bags were dirty, and this perhaps was caused by carelessness when at Raleigh, N. C., the original car was unloaded and this car reloaded.

Efforts were made by the claim agent of the Seaboard to agree upon the damages with Rose & Rogers, and to induce them to pay the draft and adjust the matter. These efforts failed, and on September 22nd, the claim agent of the Seaboard notified the shippers of the situation. Rose & Rogers also notified them of their refusal to accept the flour and their reasons therefor. The milling company declined to give any orders as to the disposition of the flour. In December the flour was sold by the Seaboard. After deducting from the proceeds of sale the freight, $408.00 for demurrage, and some other expenses, there remained $101.52 which was tendered to the milling company and refused. The bill of lading and the unpaid draft were returned to them, and they sued the initial carrier, the Norfolk and Western, as for a conversion. It is claimed for the railway company that there was neither delivery nor conversion.

Similar questions have been frequently considered by the courts. This general summary from 4 Ruling Case Law, section 294, page 842, is well supported by the cases: "The fact that a bill of lading contains a direction to notify a certain person of the arrival of the goods is no indication that he has any interest in them, for as is well known, the practice of 'notifying' a person of the arrival of goods is generally resorted to by the vendor, who, while consigning goods to himself or to his own order, wishes at the same time to have the vendee notified of the arrival so that he may be afforded an opportunity of receiving them on payment of the draft drawn on him and the delivery of the bill

of lading thereto attached. Therefore, in such a case, the carrier has no authority to make a delivery to the person so to be notified without the production of the bill of lading properly endorsed, or without being otherwise ordered by the shipper so to do, and if he does make such a delivery he becomes liable for the full value of the shipment."

In a note to *Atchison, Topeka & Santa Fe R. Co. v. Schriver*, 72 Kan. 550, 84 Pac. 119, 4 L. R. A. (N. S.) 1056, the general rule is thus stated: "It is well settled that a direction in a bill of lading or shipping receipt, to notify a certain person of the arrival of goods which are consigned to the order of the consignor or of a third person, does not justify the carrier in delivering the goods to the person whom it is directed to notify, without the production of the bill or shipping receipt properly endorsed; and if the carrier does deliver the goods to him under such circumstances, it is liable for the value thereof to the holder of the bill or shipping receipt. *Northern Pennsylvania R. Co. v. Commercial Nat. Bank*, 123 U. S. 727, 31 L. Ed. 287, 8 Sup. Ct. Rep. 266; *Southern R. Co. v. Atlanta Nat. Bank*, 56 L. R. A. 546, 50 C. C. A. 558, 112 Fed. 861; *Arkansas S. R. Co. v. German Nat. Bank* [77 Ark. 482], 92 S. W. 522, [113 Am. St. Rep. 160]; *Illinois C. R. Co. v. Southern Bank*, 41 Ill. App. 287; *Libby v. Ingalls*, 124 Mass. 503; *Union Stock Yards Co. v. Westcott*, 47 Neb. 300, 66 N. W. 419; *Bank of Commerce v. Bissell*, 72 N. Y. 615; *Wright v. Northern C. R. Co.* [Pa.], 8 Phila. 19."

None of the exceptions to this general rule are applicable in this case. Here it seems to be a mere question of the carriers' obligations under the unqualified written contract.

The subject is elaborately annotated in

*Southern Express Co.* v. *Ruth* (183 Ala. 493, 59 So.
538), Anno. Cases, 1915D, 875. The general rule is
clear that any delivery of property by a common
carrier thereof to a person unauthorized by the owner
or the person to whom the carrier is bound by con-
tract to deliver it constitutes a conversion, irrespective
of the question of negligence or the exercise of due
care. This rule has been applied where the delivery
of the goods by the carrier thereof to the wrong person
was due to mistake, and this is held to be immaterial
as affecting the liability of the carrier under its con-
tract. The initial carrier is liable for the value of goods
so wrongly delivered by the connecting carrier. *Coo-
vert* v. *Spokane, etc., R. Co.*, 80 Wash. 87, 141 Pac.
324; *Grant* v. *Northern Pacific R. Co.*, 12 Can. L. T.
492; *Louisville & Nashville R. Co.* v. *U. S. Fidelity &
Guaranty Co.*, 125 Tenn. 658, 148 S. W. 671.

The case of *Georgia, F. & A. Ry. Co.* v. *Blish Milling
Co.*, 241 U. S. 190, 36 S. Ct. 541, 60 L. Ed. 948, which
affirmed a judgment of the Georgia Court of Appeals,
15 Ga. App. 142, 82 S. E. 784, in which a recovery was
allowed, is quite similar to this case. That was a ship-
ment of a carload of flour under an order notify bill of
lading from Seymour, Indiana, to Bainbridge, Ga.
In that case also the flour was transferred to another
car by an intermediate connecting carrier. The de-
livering carrier, without requiring payment of the
draft and surrender of the bill of lading, which were
ultimately returned to the Blish Milling Co., the
shipper, delivered the car to the Draper-Garrett
Grocery Company immediately on its arrival by
placing it on the side track of that company. While
unloading, the grocery company discovered that some
of the flour was wet, and thereupon reloaded the part
removed and returned the flour to the carrier. No

claim seems to have been made in that case that this was an incomplete delivery. The litigation seems, in the Supreme Court of the United States, to have turned upon the question of whether timely and proper notice of the claim had been given. The Georgia Court of Appeals (15 Ga. App. 148, 82 S. E. 784, 787), said this in that case: "The milling company, by electing to retain title until the draft was paid, sold the goods for cash. The railway company, without any regard for the milling company's rights or wishes, and in violation of its expressed intention, undertook to let the Draper-Garrett Grocery Company have the flour on time, or without paying the draft; and of course this must be held to be a conversion. It is the wrongful exercise of dominion over another's property that makes a conversion. It is not necessary that the proof show that the defendant applied it to its own use; it need only be shown that he dealt with the property as if it were his own, and in defiance of the owner's right. It is entirely immaterial that the conversion was not for his own use, or that he derived no benefit therefrom. * * * Whenever goods which the consignor has shipped to his own order are delivered without the production of the bill of lading, the delivery is at the carrier's own risk, and subjects the carrier to liability in trover for the conversion."

Many cases might be cited enforcing this rule. We shall content ourselves with these: *Dilman Bros.* v. *Patteson Produce & Provision Co.*, 2 Ga. App. 213, 58 S. E. 365; *Early & Daniels Co., Inc.* v. *Aulander Flour Mills*, 187 N. C. 344, 121 S. E. 539; *General Electric Co.* v. *Southern Ry. Co.*, 72 S. C. 251, 51 S. E. 695, 110 Am. St. Rep. 600, 38 L. R. A. 464; *Midland Val. R. Co.* v. *J. A. Fay & Eagan Co.*, 89 Ark. 343, 116 S. W. 1171; *Kemper Mill & Elevator Co.* v. *Hines*, 293 Mo. 97, 239 S. W. 803.

In the case of *Kewanee Private Utilities Co.* v. *Norfolk Southern R. Co.*, 118 Va. 628, 88 S. E. 95, 97, a somewhat similar question arose as to. an instruction, and Keith, P., said this: "The two instructions asked for by the plaintiff are as follows: 'The court instructs the jury that if they believe from the evidence that the railroad company delivered to persons other than the plaintiff the shipment mentioned and described in the declaration, without obtaining the surrender of the bills of lading therefor, or without authority from or subsequent ratification by the plaintiff, the holder of the bills of lading, then the plaintiff is entitled to recover of the defendant the value of the goods with interest from the date of delivery. * * * That the delivery was wrongful does not admit of dispute. The freight was delivered in violation of an express stipulation upon the bill of lading, known to the railroad company, that 'the surrender of the original bill of lading, properly endorsed, shall be required before the delivery of the property.' " He concluded that the instruction referred to should have been given.

The only question in this case is a question of fact, namely, was there a delivery by the connecting carrier without the production of the bill of lading and in violation of its terms? We are of opinion that the evidence for the plaintiff supports the conclusion that there was such an illegal delivery, and that concludes this case.

This strict construction of the contract may seem to be harsh in some close cases, but when it is remembered that a very large part of the wholesale business of the country is done upon the faith of similar contracts, that is, in carloads upon order notify bills of lading, it is obvious that any failure of

the courts to enforce them strictly would be harmful. To impede or destroy this convenient method of distributing commodities to retail merchants and jobbers over extended areas, would so tend to curtail business as to be a public injury.

*Affirmed.*