In re TWIN B AUTO PARTS,
INC., Debtor.

Halart, L.L.C., Plaintiff,

v.

Independent Auto Warehouse,
Inc., Defendant.

Bankruptcy No. 98–29226–S.
Adversary No. 00–2040–S.

United States Bankruptcy Court,
E.D. Virginia,
Norfolk Division.

Jan. 4, 2001.

Jane B. Wrightson, Warsaw, VA, for debtor.

James T. Lloyd, Jr., Norfolk, VA, for plaintiff.

Peter S. Lake, J. Andrew Basham, Norfolk, VA, for defendant.

### Memorandum Opinion and Order

STEPHEN C. ST. JOHN, Bankruptcy Judge.

This matter came on for trial of the Complaint for Declaratory Judgment filed by Halart, L.L.C. ("Halart")[1] against In-

---

**1.** Since the filing of the Complaint for Declaratory Judgment, Halart, L.L.C. has changed

dependent Auto Warehouse, Inc. ("IAW") and upon the Counterclaim of IAW against Halart. This constitutes the findings of fact and conclusions of law of this Court pursuant to Federal Rule of Bankruptcy Procedure 7052.

## FINDINGS OF FACT

The instant dispute arises from the sale of substantially all of the assets of the debtor, Twin B Auto Parts, Inc. ("Twin B") to Halart as authorized by this Court in the course of Twin B's Chapter 11 bankruptcy proceeding. Twin B was an automotive parts business which had operated in this geographic area for a number of years. It began experiencing financial difficulties some two to three years prior to its bankruptcy filing on December 21, 1998. Among its difficulties was its inability to purchase adequate inventory for sale in its stores because of cash flow problems created by increased competition in the automotive parts business.

Twin B had bought parts inventory from IAW for many years on an open account basis. The president of Twin B, William O'Connor ("O'Connor"), had enjoyed a lengthy business and personal relationship with Marvin Brangan ("Brangan"), the president of IAW. IAW, which also sold certain types of automotive parts, had excess inventory of which it wished to dispose. Twin B, needing additional inventory for its stores, agreed to accept IAW's excess parts inventory ("Transferred Inventory"). This agreement was not reduced to writing but merely consisted of a verbal agreement made between O'Connor and Brangan in January or February of 1998. After receiving this Transferred Inventory, Twin B in turn would try to mar-

ket and "pay" for it in two manners. As Twin B sold the Transferred Inventory, it would either buy more inventory from IAW on open account or surrender to IAW inventory purchased from third-party vendors that Twin B and IAW believed IAW could market more successfully than the Transferred Inventory. Also, under the terms of their agreement, IAW could inspect and reclaim the Transferred Inventory. In executing this agreement, IAW sent the bulk of the Transferred Inventory to Twin B, commencing in April 1998 and continuing through August 1998. Twin B placed the Transferred Inventory among its then existing inventory.

The methodology utilized to account for the Transferred Inventory only complicated the arrangement between Twin B and IAW. O'Connor stated that it was impractical to track the Transferred Inventory by part number or any other specific identification. Instead, Twin B and IAW accounted for the Transferred Inventory only by product line or product category so that over time it was impossible to identify which specific items IAW had transferred to Twin B.[2] For example, among the Transferred Inventory was a quantity of "GMB Water Pumps." As one or more GMB Water Pumps were sold, the inventory might be replenished by Twin B purchasing more GMB Water Pumps from vendors other than IAW and by utilizing monies available to Twin B other than the sale proceeds of any of the Transferred Inventory, including its inventory financier, Heritage Bank and Trust ("Heritage"). As Twin B purchased other inventory, it became commingled with the Transferred Inventory. Twin B provided

---

its corporate name to Restoration Auto Parts, Inc. For the purposes of this Memorandum Opinion, our reference will remain to "Halart."

**2.** O'Connor testified that some thirty to forty product lines were represented in the Transferred Inventory. (Tr. at 16.)

monthly reports to IAW that would identify by dollar amount the categories of inventory represented by the Transferred Inventory.[3] Unfortunately, Twin B did not segregate the proceeds of the Transferred Inventory from other inventory proceeds; nor was there any accounting for the Transferred Inventory on an item by item basis. Therefore, with certain exceptions for unique items, over time it became impossible for either IAW or Twin B to identify which items constituted the Transferred Inventory.[4] At most, the Transferred Inventory was valued at $357,240.63 by IAW and Twin B, based on the original costs of these parts to IAW. After October 16, 1998, IAW received inventory from Twin B valued at $67,375.13, which was credited against the amount Twin B owed to IAW.[5] At no time did Twin B make any cash payments to IAW for the Transferred Inventory.[6]

Despite the oral arrangement for the Transferred Inventory, Twin B's financial condition continued to deteriorate. Heritage, the inventory financier for Twin B, also acted as the principal lending institution for IAW. Heritage became concerned about the lack of documentation relating to the Transferred Inventory and demanded that Twin B and IAW reduce their oral agreement to writing. In response to this demand, Brangan prepared a commercial

3. O'Connor attempted to explain his method of accounting for the Transferred Inventory as follows:

Q. Explain to the Court how you kept track of the dollar value of the consigned goods by category.
A. Because we only had one total. When we initially got the merchandise, we did a ratio to figure out—I'll use Fram as an example. I don't know if Fram was on here. If Fram represented three percent of the total consignment and Bendix represented ten percent of the total consignment, as the consignment dollars decreased we backed everything in at the same ratio and assumed we would sell everything exactly across the board.
Q. At one time there was $300 of inventory shipped to your stores and there was a different amount of apportioned category items?
A. Yes.
Q. And you tracked those items in proportion to the initial value of their contribution?
A. Right, and it may be off by a couple of percent.
(Trial Tr. at 16.) Apparently, when IAW provided the Transferred Inventory to Twin B, O'Connor would calculate the ratio of the amount of the Transferred Inventory represented by a particular product line to the total inventory in that product line of Twin B. Thereafter, IAW and Twin B would assume that the Transferred Inventory represented that same percentage of the total inventory in any product line, regardless of the sale of any of the Transferred Inventory or the replenishment of the inventory of a particular product line by the purchase of other parts or supplies by Twin B.

4. Although there was testimony at trial that certain "unique items" of the Transferred Inventory were identifiable, no evidence was offered as to what these items were.

5. In addition to the credits given after October 16, 1998 for returned merchandise, on August 7, 1998, IAW credited Twin B's indebtedness under the oral consignment agreement for an amount of $6568.92 representing "Eis stock return." Further, on August 6, 1998 and again on September 11, 1998, IAW added $1602.32 and $629.78 respectively to the balance owed by Twin B to reflect "cores and defects." These figures—when combined with the $357,240.63 in merchandise that IAW transferred to Twin B and the $67,375.13 in merchandise that Twin B surrendered to IAW—account for the $282,828.68 claimed by IAW against Halart.

6. O'Connor testified that the only circumstance where the "balance" on the oral consignment agreement was reduced occurred when Twin B returned an amount of the Transferred Inventory after the Chapter 11 filing of Twin B, which IAW applied as a credit to what it believed was the indebtedness owed to IAW by reason of the Transferred Inventory. (See Trial Tr. at 19.)

security agreement ("Security Agreement"), which Twin B executed on November 10, 1998. The Security Agreement stated that IAW had moved $370,000.00 worth of its automotive parts inventory to Twin B's warehouse for "the sole purpose of [allowing] Twin B to commingle this inventory with their existing inventory for the purpose of selling this inventory." Under the terms of the Security Agreement, Twin B granted IAW a security interest in certain parts inventory as listed on an exhibit thereto, and Twin B agreed to pay $6000.00 each month to IAW until Twin B satisfied the debt. Twin B also recorded in the Circuit Court of the City of Virginia Beach a financing statement that evidenced IAW's security interest.[7] Despite the Security Agreement, O'Connor and Brangan agree that it did not reflect or supercede their oral agreement. In fact, both O'Connor and Brangan agree that Twin B never paid any cash to IAW by reason of the Transferred Inventory.

On December 21, 1998 Twin B filed a petition under Chapter 11 of the United States Bankruptcy Code in this Court. As a debtor in possession, Twin B continued to operate its business and sold its parts inventory in the ordinary course of business. An official committee of unsecured creditors was formed and Brangan agreed to serve as a member of the committee. Twin B's attempts to reorganize its business proved to be unsuccessful.

Twin B solicited offers to sell substantially all of its assets. On November 10, 1999, Twin B filed with this court a Motion to Assume and Assign Leases and Sell Assets Outside of the Ordinary Course of Business Free and Clear of Liens ("Sale Motion"). The Sale Motion provided, in part, that Twin B owned tangible and in-

tangible assets, including the inventory, fixtures, equipment, goods and intangible personal property, which was described in greater detail in an exhibit attached to the Sale Motion. The attached exhibit included Halart's offer to purchase Twin B's assets. The offer proposed three alternative scenarios for purchase: one option included inventory, whereas the other two alternatives contemplated that Halart would purchase various assets that were not part of Twin B's inventory ("Purchase Offer"). Exhibit A to the Purchase Offer provided a store by store inventory and the inventory of the Twin B warehouse as of October 24, 1999. From the exhibit, it also appears that $271,981.00 worth of "Consignment Value Inventory" was deducted from the total store and warehouse inventory to reach an inventory compilation of $991,481.00. The Sale Motion indicated that Halart decided to purchase the inventory, fixtures, equipment, goods, and intangible property as described in the Purchase Offer under the terms set forth therein. The Sale Motion also noted Halart's intention to assume Twin B's outstanding leases. The Sale Motion was sent to IAW, and Brangan acknowledges he was aware of the proposed sale of substantially all of the Twin B assets to Halart.

Notice of the Sale Motion was provided to all creditors and parties in interest. On November 26, 1999, Fisher Auto Parts, Inc. ("Fisher") filed a competing bid with the Court, wherein Fisher agreed to purchase all assets of Twin B, including all merchandise held for resale at the Twin B stores, as set forth in an attached sales agreement. The Sales Agreement attached an Exhibit C–1 entitled "Consignments" which stated "to be completed by

---

**7.** The financing statement describes the collateral covered by the financing statement as "Inventory Listed Attachment 'A,'" but no attachment appears to have been appended to the financing statement.

the Debtor." In its competing bid, Fisher also proposed its intention to competitively bid against Halart or any other competitors. In the meantime, on December 6, 1999, counsel for Halart wrote to counsel for Twin B and withdrew Halart's earlier purchase offer due to an alleged material change in the financial condition of Twin B since the date of the original offer. Halart, however, reserved the right to appear at the scheduled hearing on the Sale Motion and possibly bid "depending on its continued investigation and the circumstances of the hearing on December 9, 1999."

The Court held a hearing on the Sale Motion on December 9, 1999. At the hearing both Halart and Fisher appeared and each expressed their desire to competitively bid for Twin B's assets. The Court recessed to allow Twin B to receive the best and final offers of Fisher and Halart. During the bidding, Halart submitted an offer to purchase the Twin B assets, an offer that Fisher was unwilling to match.

Halart's offer, which Twin B accepted and this Court approved, was for a purchase price as calculated in Section Two of Exhibit A to the order authorizing the sale ("Sale Order").[8] This Court entered the Sale Order on December 17, 1999.[9]

Prior to the hearing on the Sale Motion, both Fisher and Halart apparently made a number of inquiries to O'Connor and others concerning the Transferred Inventory. On November 30, 1999, O'Connor transmitted a memorandum to Alan Gauthier, Chief Financial Officer of Halart ("Gauthier"), which, among other topics, alluded to the need to address the Transferred Inventory.[10] On an unspecified date prior to the December 9 hearing, a representative of Fisher met with Brangan to decide how to handle the Transferred Inventory. As a result of this meeting, Brangan apparently believed that if Fisher was the successful bidder, the Transferred Inventory would not be a problem for IAW, and Fisher would make an acceptable purchase offer.

8. Section Two of the Exhibit to the Sale Order provides as follows:

> Purchaser shall pay cash to the Seller for all assets listed on Exhibit A, subject to verification as to existence at Closing, the following amounts:
> (a) For Furniture, fixtures, equipment, inventory and general intangibles–an amount equal to 45% of the book value of the inventory on December 10, 1999 plus $185,000.00; plus
> (b) For Cash deposits–an amount equal to the cash deposits on the closing date;
> (c) For Life Insurance Policies–an amount equal to the cash value on the closing date;
> (d) For Accounts Receivable–an amount equal to 90% of the future receivables, 85% of current receivables, 60% of 30-60 day receivables, 35% of 60-90+ day receivables and 10% of 90 receivables; plus
> (e) For Vehicles–assumption of the amounts outstanding to Heritage on the 1995 Ford Van and 1998 Buick.

9. The Sale Order authorizing the sale of the Twin B assets states in paragraph 1 thereof that Twin B owned certain assets, including the inventory, et cetera, listed on an attached exhibit, but that "[t]he property listed on Exhibit 1 expressly excludes any inventory on consignment to the Debtor."

10. Paragraph 2 of the November 30, 1999 memorandum provides as follows:

> Need to make some plans on returning the consignment inventory (Ex. attached) or making an offer to purchase it. He's priced for 65% of value, as he knows he will have to sell it to convert it to cash. He may consider trading for excess inventory that Trak has that he can sell quicker. He is in the oil, antifreeze and chemical business so any of those items may be of interest to him. He has been very fair with Twin "B" for the past 12 months as to not pulling his inventory out of our stores and we do rent our warehouse space from him. We may need to continue this for awhile as changeovers and such are done.

The sale of the Twin B assets pursuant to the Sale Order occurred and Twin B executed a Bill of Sale dated December 10, 1999, which conveyed all inventory "but exclud[ed] all inventory on consignment to Twin B." Discussions concerning the fate of the Transferred Inventory continued after the closing of the sale. On December 28, 1999, O'Connor wrote to Gauthier seeking to finally reconcile the purchase price paid by Halart for the Twin B assets, which included O'Connor's available inventory figures of December 9, 1999 and subtracted therefrom the amount of $282,828.00 designated as "Consignment Value." At an unspecified time, Brangan met with Mr. Ray Moore, a representative of Halart ("Moore"), concerning a purchase of the Transferred Inventory. Moore offered to purchase the Transferred Inventory, but IAW rejected the offer.[11]

On December 16, 1999, apparently as a result of the rejection of the Halart offer, Brangan wrote to Moore that IAW intended to take possession of the Transferred Inventory unless it received a payment of $282,828.68. On December 29, 1999, IAW demanded that any sale proceeds of any of the Transferred Inventory since December 10, 1999 be segregated. Counsel for Halart replied on January 4, 2000, admitting that the Sale Order excluded the consigned goods of IAW but indicating that Halart could return the Transferred Inventory only upon a showing of proof of ownership and more detailed information as to which specific goods IAW consigned to Twin B.

This stalemate continued and on March 1, 2000, Halart filed the Motion for Declaratory Judgment,[12] which created the instant proceeding before this Court ("Declaratory Judgment Motion").[13] The Declaratory Judgment Motion recited IAW's demand to Halart for payment of $282,828.68 or for return of the Transferred Inventory, as well as Halart's demand for documents evidencing proof of the goods held by Twin B on consignment from IAW.[14] The Declaratory Judgment Motion also recited that IAW had asserted that Halart had assumed the alleged consignment by IAW to Twin B and that Halart was ready and willing to return any allegedly consigned goods upon receipt of documentation regarding IAW's ownership. Halart prayed this Court enter a declaratory judgment that Halart did not assume the alleged consignment agreement between IAW and Twin B, or, in the alternative, have this Court determine the validity of the alleged consignment agreement.

IAW answered, denying Halart was entitled to the relief prayed for, and counterclaimed against Halart ("Counterclaim"). The Counterclaim asserted Twin B's re-

---

**11.** There is no evidence in the record as to the amount of this offer.

**12.** Although styled as a "Motion for Declaratory Judgment," the pleading was filed properly as an adversary proceeding.

**13.** Halart also disputed the amount claimed by IAW, stating that "[a]fter receiving the demand from IAW, Halart performed an inventory of its purchased inventory and determined that, even assuming all items in its possession in the various general categories of the undated one page memorandum attached to Exhibit B [to the Declaratory Judgment Motion], the value of the inventory is no more than $180,000.00." Declaratory Judgment Motion ¶ 9.

**14.** This Court's jurisdiction over the Declaratory Judgment Motion is found in the order dismissing the case of Twin B entered on December 31, 1999. In that order, this Court retained jurisdiction to hear and decide all matters relating to the Sale Order. Upon Halart's motion to reopen this case on March 23, 2000, this Court entered an order to reopen the case on May 10, 2000 following notice and a hearing on the motion.

ceipt of various automotive parts and supplies on a consignment basis from IAW. The counterclaim further noted that the actual value of the consigned inventory as of the date of the sale to Halart was $282,828.62. IAW also alleged that it demanded that Halart return the Transferred Inventory after Halart declined to purchase it. IAW further alleged that Halart had not made a payment to IAW for any of the Transferred Inventory that may have been sold after December 10, 1999. Based on these factual allegations, IAW seeks to recover based upon four theories: (1) breach of contract because by accepting possession of the Transferred Inventory, Halart assumed the terms and conditions of the consignment contract between IAW and Twin B and Halart's failure to return the Transferred Inventory constitutes breach of this assumed contract; (2) conversion due to Halart's possession and control of the Transferred Inventory; (3) a theory of unjust enrichment due to Halart's retention of the Transferred Inventory, and (4) a constructive trust theory in that by accepting possession of the Transferred Inventory from Twin B, a constructive trust was created for the benefit of IAW. Each of IAW's prayers seeks judgment against Halart for $282,828.68, the alleged value of the Transferred Inventory.[15] Halart denies that IAW is entitled to judgment in any amount. Accordingly, this Court must examine the circumstances concerning the Transferred Inventory and determine whether there is any legal basis to enter judgment against Halart for the alleged value of the Transferred Inventory or in any amount whatsoever.

## CONCLUSIONS OF LAW

### I. BREACH OF CONTRACT

■ The core of this dispute involves an oral agreement between Twin B and IAW. Twin B and IAW entered into an alleged consignment relationship. Under this so-called consignment, IAW gave certain goods to Twin B for Twin B to resell. Title in the goods did not pass to Twin B, although the timing and methodology of payment for any goods sold was not clear. In its Motion for Declaratory Judgment, Halart asks this Court to determine whether Halart assumed the alleged consignment contract.[16] To fully answer this

**15.** At the initial pretrial conference on the Declaratory Judgment Motion, the Court advised the parties of its belief that the Counterclaim constituted a noncore proceeding pursuant to 28 U.S.C. § 157, which would require this Court to do proposed findings of fact and conclusions of law for submission to the United States District Court for the Eastern District of Virginia. Both Halart and IAW consented to this Court rendering a final order of judgment on the Counterclaim as evidenced by their endorsement of an order entered by this Court on July 14, 2000.

**16.** At trial, counsel for IAW moved for judgment as a matter of law based on Bankruptcy Rule 7052(c), which provides:

If during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim, that cannot under the controlling law be maintained or defeated without a favorable finding on that issue, or the court may decline to render any judgment until the close of all the evidence.

FED R. BANKR. P. 7052(c). Counsel argued that the previous Sale Order of this Court entered December 10, 1999 judicially estopped Halart from denying its notice of the consignment relationship. Counsel for Halart cited *Lowery v. Stovall*, 92 F.3d 219 (4th Cir. 1996), for the elements that define judicial estoppel—namely that the party to be estopped must (1) seek to adopt a position inconsistent with a prior position that was (2) previously accepted by the court, and (3) do so to gain unfair advantage. *See John S. Clark Co. v. Faggert & Frieden, P.C.*, 65 F.3d 26, 28 (4th Cir.1995) ("Judicial estoppel precludes a party from adopting a position that is

question, this Court must determine (1) the nature of the Twin B–IAW agreement, and (2) whether Halart assumed the agreement between Twin B and IAW, whether it be a consignment or otherwise.

### A. Nature of the Twin B–IAW Agreement

To constitute a consignment, the party delivering the goods must do one of three things: (1) evidence the consignor's interest by a sign as required by law, (2) demonstrate that the business is known by its "creditors to be substantially engaged in selling the goods of others, or" (3) meet the filing requirements for secured transactions. Va.Code Ann. § 8.2–326 (Michie 2000). The only evidence before this Court of a consignment is a document labeled "Commercial Security Agreement" and the parties testimony as to their oral agreement. As to the Security Agreement, the parties openly admit that it does not constitute their agreement. IAW did, however, file a financing statement with the Virginia State Corporation Commission. The filing requirement for a secured transaction is designed to allow the consignor "to protect his position as against an inventory secured party of the consignee ..." *Id.* § 8.9–114 cmt. 1. In IAW's financing statement, IAW is identified as the secured creditor of Twin B in "Inventory Listed Attachment 'A.'" (Def. Ex. B.) Unfortunately, the exhibit of the financing statement does not have the attachment identifying which inventory constituted IAW's security. Without this information, the Court is left to rely on the evidence in this case as to what secured Twin B's debt to IAW. Although it is undisputed that the Transferred Inventory constituted the security, the contents of the Transferred Inventory have been left vague and unascertainable to the level of specificity this Court would need to properly evaluate the transaction. Accordingly, whether the financing statement meets the filing requirements for secured transactions—and therefore constitutes a consignment—is an issue this Court cannot decide due to insufficient evidence.

Although the parties frame the transaction involved in this case as a consignment, the transaction might more properly be identified as a "sale or return" according to Virginia's Commercial Code. In Virginia, a sale or return allows a buyer to return goods to the seller, even if the

---

inconsistent with a stance taken in prior litigation."). Counsel argued that the Sale Order discussed good faith, a fair and reasonable offer, a sale in the best interest of the estate, and referenced the consignment. Accordingly, counsel argued that Halart could not now assert that it did not consider the consignment relationship in its bid.

At trial, this Court denied IAW's motion finding that the evidence did not support a judicial estoppel theory. It is undisputed that Halart knew of the inventory transfer relationship, but the Court, as noted in its oral ruling on the motion, finds that Halart did not rely on or consider the *actual contents or value* of the Transferred Inventory in formulating its bid. Rather, Halart based its bid on a percentage of the inventory value, whatever its value and contents of the inventory might be. The value of the Transferred Inventory was credited from the purchase price but this was merely the application of a mathematical formula. This formula operated as a mechanism to accept competing bids. Halart agreed to buy the assets of Twin B for a percentage of the value of its inventory minus the deduction for the value of the Transferred Inventory. Halart did this without any knowledge of the contents of the actual Transferred Inventory, and blindly relied on its alleged value only for the purpose of negotiating a purchase price, not for the truth of the value of the Transferred Inventory itself. Furthermore, the inclusion of the notation of an alleged value of the Transferred Inventory on an exhibit to the Sale Order is hardly a sufficient "prior position" of Halart accepted by this Court to constitute an appropriate imposition of judicial estoppel.

goods conform to the contract, so long as "the goods [were] delivered primarily for resale." Va.Code Ann. § 8.2–326(1) (Michie 2000). A sale or return is useful to overcome a merchant's unwillingness to buy by allowing that buyer to return the goods should they not sell. *See id.* § 8.2–326 cmt. 1. What is in substance a sale or return transaction does not change its identity by merely labeling it a consignment. *See id.* § 8.2–326(3) ("The provisions of this subsection are applicable even though an agreement ... uses such words as 'on consignment' or 'on memorandum.' "). In light of the unimpressive evidence regarding the nature of the Twin B–IAW agreement, the Court is reluctant to label it as a consignment, sale or return, or something else altogether. The Court expressly declines to do so because the answer ultimately is academic. Whatever the nature of their agreement, the critical issue is whether Halart assumed the obligations of Twin B under the agreement. Only if Halart assumed such obligations would it then be necessary to determine exactly what obligations Halart had assumed. For the reasons noted below, however, the Court finds that Halart did not assume any obligations of Twin B under the Twin B–IAW agreement.

### B. Novation

■ Whether it be a consignment, sale or return, or otherwise, the crux of the matter depends on whether Halart assumed Twin B's obligations in the Twin B–IAW agreement. If Halart did assume the agreement, then IAW may avail itself of its contractual remedies. Although Halart frames the issue in its pleading as whether it assumed the Twin B–IAW agreement, what really matters is whether a novation occurred. In Virginia, a novation is the result of a "mutual agreement among all parties concerned for discharge of a valid existing obligation by the substitution of a new valid obligation on the part of the debtor or another." *Honeywell, Inc. v. Elliott,* 213 Va. 86, 89, 189 S.E.2d 331, 334 (1972). In the instant case, the issue is whether Twin B, IAW, and Halart all agreed that Twin B's responsibility under the Twin B–IAW agreement would be discharged by imposing upon Halart the responsibilities that formerly burdened Twin B.

■ To prove a novation, IAW must show by "clear and satisfactory" proof that the parties had "a clear and definite intention" to substitute Halart for Twin B in the IAW–Twin B agreement. *Id.* The basic elements that must be proven to establish a novation "are a previous valid obligation, the agreement of all parties to the new contract, the extinguishment of the old contract, and the validity of the new contract." *Id.* at 89–90, 189 S.E.2d 331 at 334 (noting further that "[i]f any of these essentials be absent there can be no novation."); *accord Beard v. Poe,* 211 Va. 626, 179 S.E.2d 473 (1971); *J.M. Turner & Co. v. Delaney,* 211 Va. 168, 176 S.E.2d 422 (1970); *Arlington Towers Land Corp. v. McFarland,* 203 Va. 387, 124 S.E.2d 212 (1962); *Wright v. Shortridge,* 194 Va. 346, 73 S.E.2d 360 (1952).

In the case before this court both IAW and Twin B believe that Twin B had a valid set of obligations to Twin B under their so-called consignment agreement. Although the nature of this relationship, and even its validity, is questionable for the reasons noted earlier, the point is a moot one. It is moot because the remaining elements of a novation have not been proven by clear and satisfactory proof. There is no evidence of a clear intention of all of the parties to create a novation. Halart merely agreed to purchase substantially all of Twin B's assets, excluding any of the Transferred Inventory. The plain

language of the Sale Order makes it clear that Halart was to have no involvement with the Transferred Inventory or any obligations it might impose due to the Twin B–IAW agreement. Of course, by law Halart knew or should have known that it would have to return the Transferred Inventory to its rightful owner, but by no means would this require Halart to bear the burden of the Twin B–IAW agreement. Thus far IAW has been unable to sufficiently describe the Transferred Inventory to be returned and consequently such Transferred Inventory theoretically remains with Halart today. As will be explained in greater detail below, it would be inequitable to impose upon Halart the responsibility for the faults of a sloppy agreement entered into by Twin B and IAW. There is simply no credible evidence before this Court that Halart, either through the Sale Order or by its conduct after its entry, assumed any obligation of Twin B to IAW. Without any proof of a clear intention by Halart to assume the Twin B–IAW agreement, no novation may be deemed to occur, and consequently IAW may not pursue contractual remedies against Halart.[17]

## II. ALTERNATIVE THEORIES OF RECOVERY

Having found that Halart did not assume the Twin B–IAW agreement, IAW is left to seek noncontractual remedies based on equity. In its Counterclaim, IAW asserted theories of conversion, constructive trust, and unjust enrichment. The Court will address each theory in turn.

### A. CONVERSION

Under Virginia law, "[c]onversion is the wrongful assumption or exercise of the right of ownership over goods or chattels belonging to another in denial of or inconsistent with the owner's rights." *Economopoulos v. Kolaitis*, 259 Va. 806, 814, 528 S.E.2d 714, 719 (2000) (citing *Universal C.I.T. Credit Corp. v. Kaplan*, 198 Va. 67, 75–76, 92 S.E.2d 359, 365 (1956)); *accord Unlimited Screw Prods., Inc. v. Malm*, 781 F.Supp. 1121, 1131 (E.D.Va. 1991) ("Conversion is the intentional exercise of dominion or control over another's property that so seriously interferes with the right of another to control it that the actor may justly be required to pay the full value of the property." (quoting RESTATEMENT (SECOND) OF TORTS § 222A (1965))); *Hartzell Fan, Inc. v. Waco, Inc.*, 256 Va. 294, 301, 505 S.E.2d 196, 201 (1998) ("Conversion is a tort involving injury to property, in which one wrongfully exercises or assumes authority over another's goods, depriving him of their possession. Conversion includes any distinct act of dominion wrongfully exerted over property that is in denial of, or inconsistent with, the owner's rights." (citations omitted)); *United Leasing Corp. v. Thrift Ins. Corp.*, 247 Va. 299, 305, 440 S.E.2d 902, 905 (1994). To maintain an action for conversion, the movant must "hav[e] a property interest in and [be] entitled to the immediate possession of the item alleged to have been wrongfully converted." *Economopoulos*, 259 Va. at 814, 528 S.E.2d at 719 (citing *United Leasing*, 247 Va. at 305, 440 S.E.2d at 906). No element of intent or bad faith, however, need be proven. *See Norfolk & W. Ry. Co. v. F.L. Aylor, t/a Clark Milling Co.*, 153 Va. 575, 583, 150 S.E. 252, 254 (1929) ("It is the wrongful exercise of do-

---

**17.** Even assuming there was adequate proof of assumption of the oral agreement between IAW and Twin B, there is no proof whatsoever that it was ever the agreement of these parties for Twin B to pay in full the alleged value of the Transferred Inventory in cash, particularly given the undisputed evidence here that Twin B never made any cash payments to IAW.

minion over another's property that makes a conversion. It is not necessary that the proof show that the defendant applied it to its own use; it need only be shown that he dealt with the property as if it were his own, and in defiance of the owner's right. It is entirely immaterial that the conversion was not for his own use, or that he derived no benefit therefrom.").

■ In the instant case, the evidence shows that Halart might be in possession of some goods that rightfully belong to IAW. Although there is no indication of bad faith on Halart's party, this is not necessary to prove an action for conversion. IAW has a right to the Transferred Inventory that Halart now possesses by virtue of IAW's property interest in them. The problem before this Court—a problem common to all of IAW's remaining theories of recovery—is how to identify which goods rightfully belong to IAW or even to value the amount of Transferred Inventory that Halart now has in its possession.

■ To measure damages for conversion, the general rule calls for damages at an amount equal to "the value of the property converted at the time and the place of conversion." *Goodloe Straley v. Fisher*, 176 Va. 163, 167, 10 S.E.2d 551, 553 (1940). IAW argues that this value is $282,-828.68—a number that IAW and Twin B agree is the value of the Transferred Inventory at the time of the Sale Order. The basis for this value is arbitrary and cannot bind a third party. Twin B and IAW agreed to calculate the value of the Transferred Inventory at an amount proportional to the value of all of Twin B's goods. Although there was no reason to believe that the Transferred Inventory would sell in the exact same proportion as Twin B's other goods, Twin B and IAW

both agreed that this method of calculation would be more manageable than attempting to track each sale and maintain a separate account for the Transferred Inventory proceeds. Presumably, Twin B and IAW were willing to risk the inherent inaccuracy of such a calculation method. Halart, however, had no input in this decision. In purchasing Twin B's inventory, Halart knew that it was not purchasing any of the earlier described Transferred Inventory. The evidence does not demonstrate, however, that Halart knew, or had reason to know, that neither Twin B nor IAW knew which goods constituted the Transferred Inventory. Not surprisingly, Halart has been unwilling to accept IAW's naked valuation of $282,828.68 as the value for the Transferred Inventory. Instead, Halart has indicated a willingness to return the Transferred Inventory upon proof of what constitutes the Transferred Inventory. Due to its own negligence, and that of Twin B, IAW has been unable to produce evidence to demonstrate just what makes up the Transferred Inventory. Consequently, Halart has neither returned the Transferred Inventory, nor paid for its value.

This Court is in a similar position to Halart. IAW expects this Court to value the amount of the Transferred Inventory without any evidence of the specific contents of the Transferred Inventory. Like Halart, this Court will not accept IAW's arbitrary method for calculating the value based upon a highly speculative assumption that the Transferred Inventory would sell at the same rate as Twin B's overall inventory.[18] Without any evidence of value, IAW has failed to prove the extent to which it has been damaged. Consequent-

---

**18.** In fact, IAW's alleged value of $281,828.68 is better described not even as an approximate valuation of the Transferred Inventory, but rather as IAW's and Twin B's approximation of the indebtedness owed to IAW by Twin B as a result of this business transaction.

ly, its claim of conversion must be dismissed for failure to prove damages.

## B. UNJUST ENRICHMENT

■ To establish a prima facie case of unjust enrichment, the movant must demonstrate "(1) a benefit conferred on the defendant by the plaintiff; (2) knowledge on the part of the defendant of the conferring of the benefit; and (3)[a]cceptance or retention of the benefit by the defendant in circumstances that render it inequitable for the defendant to retain the benefit without paying for its value." *Nossen v. Hoy*, 750 F.Supp. 740, 744–45 (E.D.Va.1990), *quoted in Ozberkmen v. Capital Asset Mgmt., Inc.*, Law No. 105523, 1992 WL 884672, at *4 (Va. Cir. Ct. May 14, 1992); *accord Wright v. Cangiano*, Ch. No. 15084, 1993 WL 946172, at *1 (Va. Cir. Ct. July 20, 1993); *Sevilla v. Castillo*, 28 Va.Cir. 164, 1992 WL 884677, at *2 (Cir.Ct. May 18, 1992); *E.E. Lyons Constr. Co. v. TRM Dev. Corp.*, 25 Va.Cir. 352, 1991 WL 835247, at *2 (Cir.Ct. Oct. 21, 1991). In the present case, it is undisputed that IAW has conferred a benefit on Halart by virtue of Halart's presumed receipt of goods without charge that rightfully belong to IAW. Moreover, Halart admits that it knew its purchase of goods from Twin B did not include the goods allegedly on consignment from IAW. Finally, this Court agrees with IAW that for Halart to retain the benefit of the goods, it should pay for its value or return the goods if they can be identified; to do otherwise would be inequitable. Even Halart concedes that turning over the goods is required. The problem, of course, is which goods to turn over, or alternatively, how does this Court value the consigned goods without any basis for their content? As was the case with IAW's conversion claim, the request to remedy any unjust enrichment must fail for IAW's inability to provide any credible evidence of the extent to which Halart has been enriched.

## C. CONSTRUCTIVE TRUST

■ The standard for establishing a constructive trust requires clear and convincing proof. *See Crestar Bank v. Williams*, 250 Va. 198, 204, 462 S.E.2d 333, 335 (1995); *Cooper v. Cooper*, 249 Va. 511, 517, 457 S.E.2d 88, 92 (1995). Under Virginia law, a constructive trust does not arise from the parties' intentions, but rather it is born by operation of law. *See Crestar Bank*, 250 Va. at 204, 462 S.E.2d at 335; *Leonard v. Counts*, 221 Va. 582, 589, 272 S.E.2d 190, 195 (1980). A constructive trust serves to obligate one who holds certain property to act as a trustee of the property when the property rightfully belongs for the benefit of another. No requirement exists that the property be wrongfully acquired; in fact, property rightfully acquired may still be subject to a constructive trust by operation of law if its acquisition "is contrary to equitable principles." *Crestar Bank*, 250 Va. at 204, 462 S.E.2d at 335; *accord Leonard*, 221 Va. at 589, 272 S.E.2d at 195 ("Constructive trusts arise, independently of the intention of the parties, by construction of the law; being fastened upon the conscience of him who has the legal estate, in order to prevent what otherwise would be a fraud. They occur not only where property has been acquired by fraud or improper means, but also where it has been fairly and properly acquired, but it is contrary to the principles of equity that it should be retained, at least for the acquirer's own benefit."); *Jones v. Harrison*, 250 Va. 64, 70, 458 S.E.2d 766, 770 (1995). Moreover, constructive trusts may even be "imposed on third parties based on the wrong of another." *Domurat v. Rupon*, Ch. No. 11544, 1996 WL 1065603, at *2 (Va. Cir. Ct. Sept. 9, 1996).

In the instant case, Halart's purchase of Twin B's assets resulted in Halart acquiring certain goods that properly belong to IAW. Unfortunately, exactly which goods belong to IAW remains a problem today. Although Halart purchased Twin B's assets exclusive of any goods on consignment from IAW, Halart is unable to return such goods to IAW without proper identification. Thus, this Court faces a clear example of a third party who, through no wrongdoing on its own part, enjoys possession of goods that rightfully belong to another. In *Jones v. Harrison*, 250 Va. 64, 458 S.E.2d 766 (1995), the Supreme Court of Virginia stated:

> When property is given or devised to a defendant in breach of a donor's or testator's contract with a plaintiff, equity will impose a constructive trust upon that property in the hands of the recipient even though (1) the transfer is not the result of a breach of a fiduciary duty or an actual or constructive fraud . . ., and (2) the donee or devisee had no knowledge of the wrongdoing or breach of contract.

*Id.* at 69, 458 S.E.2d at 769. In the instant case, Halart's possession of the goods at issue is not the result of fraud or a breach of any fiduciary duty, and Halart has no knowledge of any wrongdoing or breach of contract. Halart simply is a beneficiary of IAW's and Twin B's imprecise attempt at a consignment arrangement. Based on the case law explained above, this Court has the power to impose a constructive trust upon the goods at issue, yet the remedy is without teeth in that the Court is unable to decipher exactly what Halart would hold in trust for IAW.

This paper-tiger remedy is exposed by the tracing requirement, a problem to which many constructive trusts fall prey. To benefit from a constructive trust, its proponent must be able to "distinctly trace[]" the trust property. *Crestar*, 250 Va. at 204, 462 S.E.2d at 335 ("[I]n order to be entitled to the benefit of a constructive trust, a claimant's money must be 'distinctly traced' into the chose in action, fund, or other property which is to be made the subject of the trust.") (quoting *Watts v. Newberry*, 107 Va. 233, 240, 57 S.E. 657, 659 (1907)); *Cooper*, 249 Va. at 517–19, 457 S.E.2d at 92–93. In the case *sub judice*, the parties are unable to segregate IAW's goods from the goods Halart purchased from Twin B. Nor have the parties offered this Court any reasonable basis to value the windfall that Halart appears to enjoy. Without the capability to trace the goods to IAW in some definable manner, this Court cannot use equity to do the impossible and impose a constructive trust on goods that cannot be defined.

It has been noted that "courts have consistently rejected the notion that the commingling of trust property, without more, is sufficient to defeat tracing." *In re Dameron*, 155 F.3d 718, 723–24 (4th Cir. 1998). In *Dameron*, the Fourth Circuit Court of Appeals held that tracing is a matter of federal law when the items to be traced derive from the bankrupt entity. *See id.* at 723. In this case, federal law applies as to the tracing requirement, because ultimately the goods to be traced are those that IAW originally consigned to the debtor, Twin B. Under federal law, a dilemma such as the Court faces today should be resolved by the "lowest intermediate balance" rule. *See id.* at 724. According to the lowest intermediate balance rule, how to segregate the commingled trust property depends on the situation. As the Fourth Circuit noted, there can be one of three scenarios to unfold:

> [I]f the amount on deposit in the commingled fund has at all times equaled or exceeded the amount of the trust, the

trust's funds will be returned in their full amount. Conversely, if the commingled fund has been depleted entirely, the trust is considered lost. Finally, if the commingled fund has been reduced "below the level of the trust fund but not depleted, the claimant is entitled to the lowest intermediate balance in the account." In no case is the trust permitted to be replenished by deposits made subsequent to the lowest intermediate balance.

*Id.* (citations omitted) (quoting *Conn. Gen. Life Ins. v. Universal Ins. Co.*, 838 F.2d 612, 619 (1st Cir.1988)). In the instant case, the amount of the commingled trust property has been reduced by subsequent sales, but to an undetermined amount. Consequently, this Court must give to IAW the lowest intermediate balance in the trust. Unfortunately, as alluded to earlier, this is an impossible task. The parties seem content to have this court decide an all-or-nothing proposition. In the face of choosing between $282,828.68 or nothing,[19] this Court recognizes the inherent inequity that will result by giving one party a windfall. To determine how to handle the potential windfall that may result in this case, the Court looks to the common law doctrine of confusion.

### III. DOCTRINE OF CONFUSION

■ It is apt to conclude this Court's analysis under a doctrine that calls itself by the very name for which the Court believes this case should be remembered:

the doctrine of confusion. IAW has arguably established a prima facie case with respect to conversion, unjust enrichment, and its constructive trust. In each theory, however, a crucial element to be proved is left vague and open-ended: the damages element. IAW has unsuccessfully attempted to persuade this Court that it has been damaged in the amount of $282,828.68. This figure, however, is based on an extremely imprecise method of accounting for the goods given to Twin B in an alleged consignment. As between Twin B and IAW, such imprecision might be acceptable as these parties consented to such a calculation. As to Halart, a third party, such an imprecise method must be rejected under the doctrine of confusion.

■ The doctrine of confusion is a creature of common law that has been applied sparingly in Virginia. In the only Virginia case involving the doctrine, the Supreme Court of Appeals of Virginia[20] noted that the rule was one "of necessity, and imposes loss, not upon the innocent, but upon one who willfully mixes his goods with those of another, so that they cannot be distinguished and separated." *Edgewood Distilling Co. v. Rosser's Adm'r*, 116 Va. 624, 82 S.E. 716, 717 (1914). In *Edgewood*, the movant alleged that the fund at issue was commingled with whisky sales that properly belonged to the movant. *See id.* The movant insisted that the whisky sales could not be separated from the gen-

**19.** In a letter dated January 4, 2000, counsel for Halart noted that even if all items in the Twin B stores that were even vaguely similar to the scarce description of the Transferred Inventory, their value would still only "amount to no more than $180,000." (Def. Ex. O.) The Court rejects this as an option to value the Transferred Inventory because its premise is just as speculative as assuming the automotive parts of Twin B sold at a rate proportionate to the Transferred Inventory sales. There is no more reason to believe that

all of the inventory in the Twin B stores constitute the Transferred Inventory as there is to believe that any of the inventory in the stores make up the Transferred Inventory. Twin B and IAW simply did not keep track of the Transferred Inventory, and there is nothing this Court can do to correct their mistake.

**20.** Now known as the "Supreme Court of Virginia."

eral fund, therefore entitling the movant to the entire fund. *See id.* The court rejected the movant's contention and the doctrine of confusion, because the amount of whisky sales was ascertainable and therefore not "confused" with the general fund; rather, the movant was allowed "the contract price of the whiskies" and nothing more. *See id.* Although not applying the doctrine on those facts, the *Edgewood* case appears to recognize the doctrine of confusion in Virginia. For guidance on how the doctrine applies to the instant case, the Court must look outside Virginia.

The doctrine of confusion is not a rule of substantive law, but merely one of evidence:

> The rule as to the confusion of goods is merely a rule of evidence. The wrongful mingling of one's own goods with those of another, when the question of identification of the property arises, throws upon the wrongdoer the burden of pointing out his own goods, and, if this cannot be done, he must bear the loss which results from it. It is but an application of the principle that all things are presumed against the spoliator; that is to say, against one who wrongfully destroys or suppresses evidence.

*Holloway Seed Co. v. City Nat'l Bank*, 92 Tex. 187, 191, 47 S.W. 95, 97, *modified*, 92 Tex. 194, 47 S.W. 516 (1898). Simply stated, if goods have been commingled, the burden of identifying the property belongs to the one most culpable for the commingling. *See In re Thompson*, 164 Iowa 20, 145 N.W. 76, 79 (1914) ("The loss and inconvenience arising from such confusion is therefore upon the party who causes the confusion, and it is for him to distinguish and separate his own property or lose it."); *People's Nat'l Bank v. Mulholland*, 228 Mass. 152, 157, 117 N.E. 46, 48 (1917) ("[The loss] ought to fall 'on him whose

carelessness or folly or misfortune' has caused the indiscriminate intermixture." (quotation unattributed)). Case law has shown that confusion of goods can occur in one of four ways: (1) by consent of the parties, (2) by the willful, intentional act of a party, (3) by the mistake, or negligence of the party, or (4) in the inevitable case of accident where neither party is to blame. *See, e.g., In re Thompson*, 164 Iowa 20, 145 N.W. at 79; *Ayre v. Hixson*, 53 Or. 19, 32, 98 P. 515, 519 (1908). In *People's National Bank v. Mulholland*, 228 Mass. 152, 117 N.E. 46 (1917), the Supreme Judicial Court of Massachusetts noted that "[a] commingling which flows from carelessness or breach of obligation belongs to the same class as one caused by intentional misconduct." *Id.* at 157, 117 N.E. at 48. Where the confusion is the result of negligence, as appears to be the case here, the party causing the confusion will not lose his property, but must identify it or he will lose "the whole to the party with whose [his property] is intermingled." *In re Thompson*, 164 Iowa 20, 145 N.W. at 80.

The case before this Court troubles the Court greatly in that the parties insist on presenting the Court an all-or-nothing proposition. Either accept IAW's arbitrary valuation of the goods based on assumed sales in proportion to each other absent any factual basis to believe this to be the truth and award IAW $282,628.28 or give them nothing and let Halart keep what remains of the Transferred Inventory, if any. The doctrine of confusion is considered "attractive because it protects the innocent party only to the extent required [and][n]either party receives an unnecessary windfall nor suffers an unnecessary loss." David Frisch, *UCC Section 9–315: A Historical and Modern Perspective*, 70 Minn.L.Rev. 1, 18 (1985); *see also In re Thompson*, 164 Iowa 20, 145 N.W. at 79 ("The foundation of the doc-

trine of confusion of goods is the affording of protection to the innocent owner."); *Brown v. Bacon,* 63 Tex. 595, 598 (1885) ("The doctrine of confusion is extended no further than necessity requires."). Cases abound where a court divided a confused mass proportionately between the two parties. *See, e.g., Mahoney v. Citizens' Nat'l Bank of Salmon,* 47 Idaho 24, 271 P. 935 (1928); *Clay, Robinson & Co. v. Larson,* 125 Minn. 271, 146 N.W. 1095 (1914); *D.M. Osborne & Co. v. Cargill Elevator Co.,* 62 Minn. 400, 64 N.W. 1135 (1895); *Horne v. Hoyt,* 68 N.H. 201, 44 A. 292 (1895); *Colley v. H.L. Edwards & Co.,* 258 S.W. 191 (Tex.Civ.App.1924); *Belcher v. Cassidy Bros. Live–Stock Comm'n Co.,* 26 Tex.Civ. App. 60, 62 S.W. 924 (1901); *Mittenthal v. Heigel,* 31 S.W. 87 (Tex.Civ.App.1895). Yet, even this doctrine cannot escape a windfall all the time. As Professor Frisch noted, "Only in the absence of [evidence identifying each party's respective share] will title to the entirety vest in the innocent party." Frisch, *supra,* at 18. In cases such as the case *sub judice,* where the party bearing the burden of identifying the property has not carried its burden, courts have awarded the entire confused mass to the less culpable party. *See, e.g., Allis Chalmers Mfg. Co. v. Security Elevator Co.,* 140 Kan. 580, 38 P.2d 138 (1934); *Kreth v. Rogers,* 101 N.C. 263, 272, 7 S.E.

682, 686 (1888). Although a windfall inevitably results, the result is as close to justice as a court may reach in such circumstances. The party most responsible for the dilemma must suffer the consequences for failing to resolve the dilemma. *Cf. Ayre v. Hixson,* 53 Or. 19, 32, 98 P. 515, 519 (1908) ("If it were possible to ascertain the relative proportion of the sheep which belonged to the mortgagor and mortgagee, respectively, each might take his proportionate share of the whole; but . . . this is not possible . . . and it is their fault that there is confusion, and they must suffer the loss.").

In *Ayre,* the Supreme Court of Oregon held that the purchaser of the commingled goods stood in the same position as the vendor regarding fault because the purchaser had notice of the commingling. *See id.; see also Allis Chalmers Mfg. Co. v. Security Elevator Co.,* 140 Kan. 580, 38 P.2d 138 (1934) (" 'Purchasers with notice are of course in no better condition than their vendors in respect to a confusion of goods.' " (quoting 12 C.J. 496)). The same cannot be said in the instant case. Although Halart knew that IAW had allegedly "consigned" goods to Twin B, there is no evidence Halart realized that the goods were commingled and incapable of being identified.[21] Halart consistently has maintained the position that upon proof of iden-

**21.** Certainly, there is evidence before this Court that Halart knew of the Transferred Inventory. For example, in a memorandum dated November 30, 1999 from Bill O'Connor to Alan Gauthier, O'Connor notes a "[n]eed to make some plans on returning the consignment inventory . . . or making an offer to purchase it." (Def. Ex. C.) In a letter dated December 29, 1999 from counsel for IAW to counsel for Halart, IAW's counsel demanded return of the Transferred Inventory or payment of an acceptable sum, which he believed to be $271,918.00. (*See* Def. Ex. N.) Counsel for Halart responded that it had "no desire to retain those items," but required the specific identification of the Transferred Inventory through model numbers, type numbers, or

some other identifying mark. (*See* Def. Ex. O.) Although IAW attached inventory sheets to several different letters of correspondence, IAW has never been able to sufficiently identify the Transferred Inventory. Counsel for Halart illustrated this point in its reply to IAW in a letter dated January 4, 2000:

[Y]our letter of December 29, 1999 . . . does not contain sufficient detail to reveal what items were consigned. The list has no identifying numbers of the goods, and, in fact, does not even detail the number of each specific item consigned.

. . . .

. . . For example, "Fram Filters" are listed as part of the consignment. How may

tification of the goods, it would return such goods to IAW. No such proof has ever been forthcoming, in large part because Twin B and IAW entered into an arrangement in which tracking the so-called consigned goods was impossible. This Court therefore finds that IAW is more culpable than Halart for the commingling of goods because IAW and Twin B agreed to such an imprecise arrangement and IAW never asked Twin B to segregate the sale proceeds of the Transferred Inventory. Unable to sufficiently identify the goods belonging to them, IAW must now accept the consequence it risked when it engaged in the Inventory Transfer with Twin B.

## IV.

Having held that Halart did not assume the Twin B–IAW oral Inventory Transfer agreement, and having failed to establish the amount of damages under its theories of constructive trust, conversion, and unjust enrichment, the Court finds that IAW is not entitled to recovery from Halart and grants the relief sought in the Motion for Declaratory Judgment and declares that Halart did not assume any agreement between IAW and Twin B. Therefore, the Motion for Declaratory Judgment and the Counterclaim are dismissed with prejudice.

IT IS SO ORDERED.

Fram Filters were consigned? What Model Number, Type Number or other identifying mark can distinguish these filters? The same questions must be answered regarding all items listed in the "Consignment Inventory."
(Def. Ex. O.) Without any knowledge beforehand of IAW's inability to designate its property, Halart cannot be held equally responsible for the commingling. Although Halart knew of the Transferred Inventory, it had no reason to know that IAW had no objective way of identifying the contents of the Transferred Inventory. It is true, moreover, that Halart has replenished the stores since purchasing substantially all of Twin B's assets, but this does not make Halart equally responsible for the commingling. No evidence has been offered to show that Halart is unable to segregate these post-sale goods from the ones already commingled with the Transferred Inventory. The issue is, and has always been, IAW's capability to identify the Transferred Inventory. This IAW cannot do, and therefore it must accept the consequences for its poor business judgment.