PRESENT: Carrico, C.J., Lacy, Hassell, Keenan, Koontz, and Kinser, JJ., and Stephenson, Senior Justice

ANASTASIA ECONOMOPOULOS, ET AL.

OPINION BY
v.  Record No. 991245    SENIOR JUSTICE ROSCOE B. STEPHENSON, JR.
April 21, 2000
ANDREW M. KOLAITIS

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Stanley P. Klein, Judge

This case involves claims of constructive fraud, conversion, "intentional interference with inheritance," and unjust enrichment.  In this appeal, the plaintiffs have assigned twelve errors, and the defendant has assigned one cross-error. These alleged errors present three principal issues, viz.:

1.  Whether the trial court erred in finding the existence of a confidential relationship between a father and son.

2.  Whether the trial court erred in striking the plaintiffs' constructive fraud claim.

3.  Whether the trial court erred in striking the plaintiffs' claims of conversion, "intentional interference with inheritance," and unjust enrichment.

I

By separate four-count motions for judgment, Anastasia Economopoulos, Aphroditi Kolaitis, and Fereniki Kolaitis (the Plaintiffs) sued Andrew M. Kolaitis (the Defendant).  Each Plaintiff sought to recover $262,500 in compensatory damages and

$50,000 in punitive damages arising from the redemption of certain Treasury bills.  The Plaintiffs alleged conversion and misappropriation in Count I, constructive fraud in Count II, unjust enrichment in Count III, and "tortious interference with inheritance" in Count IV.  The Plaintiffs also sought certain equitable relief, including the imposition of a constructive trust.

By an agreed order, the actions were transferred to the chancery side of the court, and the trial court consolidated them for trial.  At the conclusion of the Plaintiffs' case-in-chief, the trial court struck the Plaintiffs' evidence as to all counts and entered judgment in favor of the Defendant.  This appeal ensued.

II

Michael A. Kolaitis died on April 21, 1997.  He had four children, Anastasia Economopoulos, Aphroditi Kolaitis, Fereniki Kolaitis, and Andrew M. Kolaitis.

Michael had been a businessman in Arlington County, and, from the mid-1960's until 1980, he operated the Parkington Sleep Center.  In 1966, Andrew began working at the business on a part-time basis, and, upon his graduation from college in 1973, he became a full-time employee.  About 1980, Andrew took over the business from his father, although Michael continued to work

part-time, and the two remained co-owners of the real property upon which the business was located.

Andrew operated the business until 1990, when the business property and several adjoining properties, also co-owned by Michael and Andrew, were sold to Arlington County for about $3 million. As a result of the sale, Michael and Andrew's business relationship terminated, and, as co-owner of the properties, Michael netted $956,502.91.

Michael invested $900,000 of his portion of the sale proceeds in five Treasury bills: three $200,000 bills, each titled jointly with a daughter; a $50,000 bill titled jointly with Andrew; and a $250,000 bill titled solely in Michael's name. The Treasury bills were deposited in Michael's bank account, and Michael told his three daughters that he had invested $200,000 for each of them.

From April 1990 until May 1996, Michael renewed the Treasury bills quarterly. In 1994, Michael executed a codicil to his 1992 will, directing his executor (Andrew) to divide into three equal shares $600,000 of the Treasury bill funds and to pay the shares to his three daughters.

From about 1991 until 1996, Andrew and Michael engaged the same accountant, Larry D. Spring. Spring prepared their personal tax returns, and each was present when the other's tax return was discussed with Spring.

On April 1, 1996, Michael signed a check, prepared by and payable to Andrew, in the amount of $40,000. Andrew testified that Michael had directed him to prepare the check and that Michael intended the sum as four gifts of $10,000 each to Andrew, Andrew's wife, and Andrew's two sons.

On April 3, 1996, Andrew, at Michael's request, was added as a signatory on Michael's First Union Bank account. Andrew, however, wrote no checks on that account.

In March 1996, at age 82, Michael was diagnosed with kidney disease, and he was hospitalized for renal failure several times between March and June of that year. During this period, Michael's health steadily declined. In late June 1996, Michael began thrice-weekly dialysis treatments, which continued until his death. About the same time, Michael's wife, Theresa, also was experiencing serious medical problems. She was diagnosed with cancer and underwent treatment until her death in January 1997.

In May 1996, Michael, during one of his hospitalizations, directed Andrew to retrieve Michael's NationsBank checkbook from his house. On May 16, Andrew brought the checkbook to the hospital, and Michael instructed Andrew to prepare a check, which Michael signed, payable to Andrew and in the amount of $300,000. At that time, Michael's account did not contain sufficient funds to cover the check.

On May 17, 1996, while Michael was hospitalized, Andrew went to Michael's home and retrieved Michael's mail, including renewal notices for the Treasury bills. Michael, however, had decided to redeem all of the Treasury bills so that he would have control over his funds. Consequently, Michael directed Andrew to hold the $300,000 check until June 27, 1996, the day the Treasury bills were to be redeemed and the funds deposited in Michael's NationsBank account. Michael also directed Andrew to place the funds represented by the check in an account in Andrew's name and to hold the funds until further notice. Andrew did as directed.

In early July 1996, Michael told Andrew that he wanted $140,000 of the $300,000 returned to him and that the $160,000 balance was a gift to Andrew. Consequently, at Michael's direction, Andrew drew two checks, payable to Michael, each in the amount of $70,000. Thereupon, Michael deposited one of the checks in a new Signet Bank account, and he deposited the other $70,000 check in his existing account at Chevy Chase Bank. The funds remained in these two accounts, subject to Michael's control, until his death. Upon Michael's death, the funds were paid to Andrew.

On July 11, 1996, Michael executed a new will by which he divided his residuary estate equally among his four children. By his new will, Michael also revoked all prior wills and

codicils. This will was admitted to probate upon Michael's death.

Throughout 1996, Michael exercised control of his various bank accounts and made financial decisions on his own. In addition to the gifts to Andrew, Michael wrote checks to Anastasia in July 1996 for expenses she incurred on a trip to Virginia to visit him. Michael also made separate gifts to each of Anastasia's two children, as well as a $4,000 gift to Anastasia.

In November 1996, Michael learned that Fereniki had altered a check he had drawn by changing its face amount. Up to that time, Fereniki had filled out many of Michael's checks for his signature. Upon learning of the altered check, Michael took steps to ensure that Fereniki no longer had access to his checkbooks.

In January 1997, Michael directed Andrew to take his financial information to Spring so that Spring could prepare Michael's tax returns. Andrew took the information to Spring and advised Spring of the gifts that Michael had made to him in 1996. Spring then prepared gift tax returns that Michael subsequently signed.

### III

Initially, we consider the effect to be given to Andrew's testimony resulting from his having been called and examined by

6

the Plaintiffs as an adverse party.  It is well established that, when an adverse party is called and examined by an opposing party, the latter is bound by all of the former's testimony that is uncontradicted and is not inherently improbable.  Brown v. Metz, 240 Va. 127, 131, 393 S.E.2d 402, 404 (1990); Crabtree v. Dingus, 194 Va. 615, 622, 74 S.E.2d 54, 58 (1953); Saunders v. Temple, 154 Va. 714, 726, 153 S.E. 691, 695 (1930).  Also, under such circumstances, Code § 8.01-397 (the so-called "Deadman's Statute") does not apply.  Brown, 240 Va. at 131-32, 393 S.E.2d at 404; Balderson v. Robertson, 203 Va. 484, 488, 125 S.E.2d 180, 184 (1962).

In the present case, Andrew's testimony about the events in issue is uncontradicted and is not inherently improbable. Nevertheless, the Plaintiffs contend that these longstanding evidentiary rules do not apply in matters regarding confidential relationships or claims of fraud.  They cite no authority for this proposition, and we are not aware of any.  We see no reason to create this exception to these rules, and, therefore, we reject the Plaintiffs' contention.

IV

A

We now consider the issue raised by Andrew's assignment of cross-error; that is, whether the trial court erred in finding the existence of a confidential relationship between Andrew and

7

Michael.  The existence of such a relationship would give rise to a presumption of fraud and shift to Andrew the burden to prove the bona fides of the transactions at issue.  Nicholson v. Shockey, 192 Va. 270, 277-78, 64 S.E.2d 813, 817 (1951).

A parent-child relationship, standing alone, is insufficient to create a confidential or fiduciary relationship.  Nuckols v. Nuckols, 228 Va. 25, 36-37, 320 S.E.2d 734, 740 (1984); Carter v. Carter, 223 Va. 505, 509, 291 S.E.2d 218, 221 (1982).  On the other hand, we have found a confidential relationship to exist in a familial relationship that is accompanied by an attorney-client relationship, Nicholson, 192 Va. at 276-77, 64 S.E.2d at 817, or by a principal-agent relationship, Creasy v. Henderson, 210 Va. 744, 749-50, 173 S.E.2d 823, 828 (1970).  We also have recognized a confidential relationship where one family member provides financial advice to or handles the finances of another family member.  Jackson v. Seymour, 193 Va. 735, 740-41, 71 S.E.2d 181, 184-85 (1952).

In the present case, the Plaintiffs, in claiming that a confidential relationship existed between Michael and Andrew, rely strongly on Michael and Andrew's seventeen-year business association.  While this association existed, such a relationship may have arisen.  However, the business association ended in 1990, approximately six years before the time of the events at issue in this case.  Therefore, Michael and Andrew's

8

former business association cannot serve as a basis for a confidential relationship at the time of the events at issue.

The Plaintiffs further assert that, after 1990, Andrew advised and assisted Michael in his business affairs. Although Andrew did assist his father in his latter years, the undisputed evidence shows that Michael had complete and exclusive control of his financial affairs up to the time of his death.

We conclude, as a matter of law, that the evidence fails to establish a confidential relationship between Michael and Andrew, and the trial court erred in finding otherwise. Consequently, the transactions at issue were not presumptively fraudulent, and the burden to prove fraud remained on the Plaintiffs.

B

Next, we consider whether the trial court erred in striking the Plaintiffs' evidence with respect to their constructive fraud claim. Fraud, whether actual or constructive, must be proved by clear and convincing evidence. Henderson v. Henderson, 255 Va. 122, 126, 495 S.E.2d 496, 499 (1998).

> A finding of constructive fraud requires proof that a false representation of a material fact was made, innocently or negligently, and that the injured party suffered damage as a result of his reliance on the misrepresentation. . . . In addition, the evidence must show that the false representation was made so as to induce a reasonable person to believe it, with the intent that the person would act on this representation.

9

<u>Id</u>. (citations omitted).

When the sufficiency of a plaintiff's evidence is challenged by a motion to strike, a trial court must resolve all reasonable doubt as to the evidence's sufficiency in the plaintiff's favor and deny the motion unless it is conclusively apparent that the plaintiff has proved no cause of action. <u>Higgins</u> v. <u>Bowdoin</u>, 238 Va. 134, 141, 380 S.E.2d 904, 908 (1989); <u>Williams</u> v. <u>Vaughan</u>, 214 Va. 307, 309, 199 S.E.2d 515, 517 (1973). When a trial court strikes a plaintiff's evidence, an appellate court, in reviewing the ruling, must view the evidence and all reasonable inferences to be drawn therefrom in the light most favorable to the plaintiff. <u>West</u> v. <u>Critzer</u>, 238 Va. 356, 357, 383 S.E.2d 726, 727 (1989).

As previously stated, there is no presumption of fraud in the present case because Michael and Andrew did not have a confidential relationship at the time of the events at issue. Consequently, when we view the Plaintiffs' evidence in the light most favorable to them, absent a presumption of fraud, we are compelled to conclude that the Plaintiffs failed to present a <u>prima</u> <u>facie</u> case of constructive fraud. To the contrary, the Plaintiffs' uncontradicted evidence shows that Michael intended to give Andrew the $160,000 and that Michael also intended to redeem the Treasury bills. Moreover, the Plaintiffs do not contend that Michael was enfeebled in mind or subjected to undue

10

influence, and, indeed, the evidence clearly shows that he was fully capable of managing his financial affairs and did so until the time of his death.  We hold, therefore, that the trial court did not err in striking the Plaintiffs' evidence relating to their claim of constructive fraud.

V

The Plaintiffs also contend that the trial court erred in striking their claims of conversion, unjust enrichment, and "tortious interference with inheritance."  We do not agree.

Conversion is the wrongful assumption or exercise of the right of ownership over goods or chattels belonging to another in denial of or inconsistent with the owner's rights.  Credit Corp. v. Kaplan, 198 Va. 67, 75-76, 92 S.E.2d 359, 365 (1956).  An action for conversion can be maintained only by the person having a property interest in and entitled to the immediate possession of the item alleged to have been wrongfully converted.  United Leasing Corp. v. Thrift Ins. Corp., 247 Va. 299, 305, 440 S.E.2d 902, 906 (1994).

In the present case, the Plaintiffs were not entitled to the immediate possession of the Treasury bills at the time they allegedly were wrongfully converted.  Moreover, as the trial court correctly noted, "the failure to renew the Treasury bills cannot be a conversion because, even assuming that Andrew Kolaitis was involved in the fact that they were not renewed,

11

the monies from the T-bills went into an account in Michael Kolaitis' name."

Additionally, as previously noted, the uncontradicted evidence shows that Michael intended to redeem the Treasury bills and to make the $160,000 gift to Andrew. In the face of that evidence, there could be no conversion, even if we assume that the Plaintiffs had standing to institute the action.

The same analysis is applicable to the Plaintiffs' claim of unjust enrichment. The uncontradicted evidence of Michael's intent respecting the redemption of the Treasury bills and the gift to Andrew runs counter to any such claim.

We also agree with the trial court that a cause of action for "tortious interference with inheritance" is not recognized in Virginia. A person who is mentally competent and not subject to undue influence may make any disposition of his property he chooses during his lifetime or by will at his death. Moreover, the Plaintiffs had only an expectancy in the Treasury bills while Michael was alive and in control of them.

VI

In sum, we hold the following:

1. A confidential relationship did not exist between Michael and Andrew, and, therefore, there was no presumption of fraud.

12

2.    The trial court did not err in striking the Plaintiffs' constructive fraud cause of action because their uncontradicted evidence failed to present a _prima facie_ case of constructive fraud.

3.    The trial court did not err in striking the Plaintiffs' claims of conversion, unjust enrichment, and "tortious interference with inheritance."

Accordingly, the trial court's judgment will be affirmed.

_Affirmed_.