PRESENT: All the Justices

BRADLEY COLAS, ET AL.

v. Record No. 211226

OPINION BY
JUSTICE STEPHEN R. McCULLOUGH
JANUARY 26, 2023

LISA TYREE, AS CO-ADMINISTRATOR
OF THE ESTATE OF JEFFREY TYREE,
DECEASED, ET AL.

FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
Kevin M. Duffan, Judge

Bradley Colas, a police officer, shot and killed Jeffrey Tyree. A jury found that Colas was liable for battery and awarded damages to Tyree's estate. Colas appeals from this decision, arguing that his motion to strike should have been granted because, when he fired the fatal shot, he was acting in defense of another. Colas asserts that the shot was justified because Tyree, who had experienced a mental breakdown, had been tackled by another officer, had fallen to the ground, had picked up a knife, and was holding the knife in the air in close proximity to an officer who was lying on the ground next to Tyree. The plaintiffs' own uncontradicted evidence established that Detective Colas was justified in firing the shot. Applying the adverse party witness rule, the estate is bound by this uncontradicted evidence. Accordingly, we reverse.

BACKGROUND

I.    TYREE SUFFERS FROM A MENTAL BREAKDOWN.

Lisa Tyree, Jeffrey Tyree's sister, whom we will refer to as Lisa for the sake of clarity, was "extremely close" to her brother. She saw him and spoke with him "just about every day." She described her brother as "the most caring, giving person that you could ever meet." About four to five days before the police were called, she observed a dramatic change in her brother's behavior. She said she had "never seen him act the way he did" during this time. "He was very

angry. He was all over the place with his texts and his conversations . . . just crazy behavior." She said, "I've never seen him do that." She did not "know what was wrong with him." She tried to talk to him because "he wasn't in his right mind" but "[e]very time someone tried to approach him and talk to him about getting help, it just — it just made it worse." During this period, Tyree's behavior kept "escalating."

On Saturday, February 9, 2019, Lisa went to her mother's house. Tyree was there, sitting in a chair, outside. Lisa was startled. "[H]e just was crazy." Tyree said he was waiting for their mother, who was very ill, "to come home from the hospital." Given their mother's poor health, it "was just absurd for him to even think that." Lisa described her brother as follows: "His hair was crazy wild. His veins were poking out of his neck. He was so angry. He was just like cussing, saying things that I had never heard him say, just really, really angry and erratic." She told him he needed to go to the hospital to get help or she would call the police. Tyree responded angrily; he stood up and bumped her with his body, "cussing and talking all erratic," calling her a "bitch" and telling her to "mind [her] own F-ing business." Tyree was "talking crazy nonsense and just very, very angry." "[H]e kept bumping me and he was spitting on me," Lisa said, "and he literally bumped me from the start of the garage all the way up to the fence until I fell down." Lisa had never seen him do anything like that. She decided to call the police. As she was leaving, she told Tyree, "[i]f you're not going to go get some mental health, you're going to end up going to jail." Tyree responded, "I'm not going to go to jail. I'll go to the morgue before I go to the jail."

II.    POLICE ARRIVE AT THE SCENE AND DEVELOP A PLAN TO SUBDUE TYREE USING NON-LETHAL FORCE.

After the police were called, approximately 10 to 15 officers responded. Officer Sam Beaton was one of the first to arrive at the scene. Upon seeing Tyree with a knife, Beaton

2

unholstered his weapon. Tyree advanced on him with a knife in his hand. Beaton retreated beyond the fence that surrounded the yard. He then began to talk to Tyree in an effort to calm him.

The knife Tyree held has a six-inch blade, with a serrated edge on one side and a plain edge on the other. One officer described it as a "military-style knife."

A number of police officers converged on the scene. Captain Kenneth Spivey was the highest-ranking officer at the scene. Sergeant Adam Bernstein managed the details of the situation. Detective Colas – one of the responding officers – was trained to deal with persons experiencing a mental health crisis, and he is a certified crisis negotiator. Sergeant Bernstein tasked Colas to work as a crisis negotiator, "to coach Officer Beaton through the negotiations" with Tyree, and to help Beaton build rapport. For approximately two and a half hours, various officers, and Officer Beaton in particular, spoke with Tyree, attempting to de-escalate the situation. The ultimate goal was to persuade Tyree to put the knife down and receive help from a mental health professional. Tyree appeared angry, agitated, and suicidal. Police had Tyree's brother talk to him, but that appeared to make him angrier, so that conversation was discontinued. The officers provided Tyree with a cigarette and then a soda. Over and over the officers tried to convey to Tyree that they wanted to help him, that they wanted to get him safely into custody so he could see a clinician. At times it appeared that they were making progress, but then Tyree would lapse back into anger and frustration. During this time, Tyree never made a threat to any specific officer and did not lunge at any of them.

Tyree would sometimes hold the knife to his own throat. He said several times "that this is only going to end one of two ways. I'm going to slit my throat and you guys are going to watch me bleed out or I'm going to charge at an officer and force you to shoot me." He said he

3

did not want to hurt the officers but said he would if they made him or if it was what he had to do. Tyree seemed to become "increasingly agitated."

The officers developed a plan: they would induce Tyree to put the knife down and advance to the edge of the yard to obtain some cigarettes. At that point, Sergeant Bernstein would give a distinctive hand signal. Officer Nigal Tuft-Williams would then signal to Officer Dalton Ennis to deploy and fire a SAGE device at Tyree. The SAGE is a device that fires rubber bullets. After the SAGE shot, a rapid action team would safely take Tyree into custody. Detective Colas was not sure Officer Tuft-Williams understood the plan, so he talked to him over a cell phone and used hand gestures in an attempt to communicate the plan. The officer holding the SAGE device was moved behind a shed because Tyree became very agitated at the sight of the device.

Tyree was offered some cigarettes. He placed the knife down and walked over to retrieve the cigarettes. Detective Colas had his gun drawn, testifying that he feared Tyree could retrieve the knife, scale the low fence, and possibly harm an officer. Sergeant Bernstein then gave the signal.

III.    THE PLAN GOES AWRY AND TRAGEDY ENSUES.

Either Tuft-Williams misunderstood the plan, or Detective Colas did not communicate the plan correctly, because instead of giving the signal to deploy the SAGE, Tuft-Williams ran into the yard and tackled Tyree. Tyree picked up the knife at about the same time Officer Tuft-Williams tackled him. Both Tuft-Williams and Tyree fell to the ground, flat on their backs. Both Tyree and Tuft-Williams were lying on the ground parallel to each other in close proximity. Officer Beaton testified, "They were in direct proximity of each other. The best way I could describe it is it's almost like they were laying in bed next to each other facing the same

4

direction." According to Sergeant Bernstein, Officer Tuft-Williams was within reach of Tyree. Tyree lifted the knife up and extended his arm straight in the air. Officer Ennis testified to similar effect: that Tuft-Williams and Tyree were on the ground, that Tyree extended the knife in the air, and that this movement occurred before Detective Colas fired his weapon. Tuft-Williams testified to his close proximity to Tyree on the ground and how he saw the knife rise in the air.

At that moment, after Tyree extended the knife in the air, Detective Colas fired a single shot from his service weapon. At the trial of this case, he testified that he fired because he believed Officer Tuft-Williams was in danger of grave harm or death. On re-direct, he stated that "[w]hen I fired the shot at [Tyree], it was to save Officer Tuft-Williams' life because [Tyree] was holding this knife up in the air toward Officer Tuft-Williams and it looked like he was about to stab Officer Tuft-Williams." Officer Beaton similarly testified that he thought Officer Tuft-Williams was at risk of serious injury or death at that moment. The tackle, the raising of the knife, and the shot all happened "very, very quickly, within a second or two." Following the shot, the knife came down on Tyree's chest, but it did not penetrate.

Tyree immediately received medical attention and was placed into an ambulance that had been waiting, but the shot proved fatal.

Tyree's estate sued Detective Colas and Officer Tuft-Williams, alleging two counts: gross negligence and battery. The estate alleged that police shot Tyree while he was unarmed, lying on the ground. The trial court granted Officer Tuft-Williams' motion to strike and denied Detective Colas' motions to strike. A jury returned a verdict in favor of the estate on the battery count but found for the defense on the gross negligence count. We awarded Detective Colas an appeal.

5

ANALYSIS

Detective Colas assigns the following error:

> The trial court erred in denying Detective Colas's Motions to Strike the Evidence and to Set Aside the Verdict where the uncontradicted evidence — including binding testimony from Detective Colas as the Estate's adverse witness — all supported that Detective Colas fired a single shot at Tyree under the reasonable belief that such action was necessary to save the life of a fellow officer whom Tyree had placed in immediate peril with a raised knife.[1]

I.    STANDARD OF REVIEW AND THE ADVERSE PARTY WITNESS RULE.

"When parties come before us with a jury verdict that has been approved by the trial court, they hold the most favored position known to the law." *Xspedius Mgmt. Co. of Va. v. Stephan*, 269 Va. 421, 424 (2005) (quoting *Stanley v. Webber*, 260 Va. 90, 95 (2000)). Furthermore, "[t]he trial court's judgment is presumed to be correct, and we will not set it aside unless the judgment is plainly wrong or without evidence to support it." *Id.* at 424-25 (quoting *Stanley*, 260 Va. at 95). Finally, "[w]e view the evidence and all reasonable inferences fairly deducible from it in the light most favorable to the prevailing party at trial." *Id.* at 425. The estate prevailed on the battery claim. The defense prevailed on the gross negligence claim.

---

[1] The estate asks us to dismiss the appeal on two grounds. It argues that the statement of facts is faulty because it does not properly account for the standard of review and it further contends that the assignment of error is defective because it "combine[s] two different rulings into one assignment of error." Appellee's Br. 22. We conclude that neither ground provides a basis to dismiss the appeal. First, the assignment of error, while challenging two distinct rulings, centers on a single issue, namely, whether the evidence establishes self-defense as a matter of law. Second, it will always be possible in a sufficiency of the evidence case, where the arguments focus on the facts and inferences that can be drawn from the evidence, to contend that a statement of facts does not properly account for the standard of review. In this instance, the drastic remedy of dismissal is not warranted.

6

Our review of the evidence in this case is also informed by the "adverse party witness" rule, which provides that "when an adverse party is called and examined by an opposing party, the latter is bound by all of the former's testimony that is uncontradicted and is not inherently improbable." *Economopoulos v. Kolaitis*, 259 Va. 806, 812 (2000).

> When a party has called an adverse witness, usually the other party or an employee thereof, it is often said that the adverse witness's testimony is "binding" on the calling party. This applies, however, only to so much of the adverse witness's testimony as is *not contradicted by or in conflict with the calling party's other evidence.*

Kent Sinclair, The Law of Evidence in Virginia § 15-40[c], 1183 (8th ed. 2018) (emphasis in original). The rule is apparently grounded in the notion that, "[b]y calling the witness . . . a party represents him to the court as worthy of credit." I Francis Wharton, A Commentary on the Law of Evidence in Civil Cases 523-24 (1877). Detective Colas was called as a witness by the estate. Therefore, the estate is bound by his testimony, but only insofar as it "is uncontradicted and is not inherently improbable." *Economopoulos*, 259 Va. at 812.

Several examples illustrate the application of the doctrine. In *Beale v. Jones*, 210 Va. 519, 522 (1970), this Court reversed a jury's negligence verdict against Beale based on the uncontradicted testimony of an adverse party witness that Beale's negligence was not the proximate cause of the plaintiff's injuries. Jones brought a personal injury suit against two drivers, Stecker and Beale, for injuries sustained when her vehicle was struck by Stecker's. *Id.* at 520. Jones was turning when a car driven by Stecker struck Jones' car. *Id.* Soon afterwards, Stecker's car was struck again, this time by Beale. *Id.* Beale was intoxicated. *Id.* at 520-21. Jones brought suit against both Stecker and Beale, arguing that Beale's negligent conduct was the proximate cause of Stecker's collision with Jones. *Id.* at 520-22. At trial, Stecker testified as an adverse party witness "that Beale's presence and conduct did not 'detract' his attention from

7

the road." *Id.* at 522. Although the jury returned a verdict against both Beale and Stecker, this Court "found the evidence insufficient to support a verdict against [Beale]." *Id.* Given Stecker's "positive and uncontradicted testimony," the jury's finding that Beale's negligence was a proximate cause of Jones' injuries was based solely on "conjecture or speculation." *Id.*

In *Nosay v. Owens*, 193 Va. 343, 347-49 (1952), this Court again set aside a jury's negligence verdict based on the uncontradicted testimony of an adverse party witness. A six-year-old boy was injured when he was struck by the defendant's vehicle. *Id.* at 344-45. However, the defendant testified as an adverse party witness that the boy ran out from behind an oncoming car and into the side of his vehicle. *Id.* at 347. The Court held that the defendant's uncontradicted testimony, to which the plaintiff was bound, demonstrated that he "violated no duty imposed upon him by law." *Id.* at 348-49. Therefore, this Court reversed the judgment of the trial court and entered final judgment in favor of the defendant. *Id.* at 349.

We have also applied the adverse party witness rule to affirmative defenses, such as assumption of the risk and contributory negligence. In *S&W Motor Lines, Inc. v. Bayliss*, 212 Va. 124, 124-25 (1971), this Court held that the uncontroverted testimony of an adverse party witness was sufficient to establish contributory negligence as a matter of law and justified reversing the jury's verdict in the plaintiff's favor. The plaintiff brought a wrongful death action on behalf of her husband against a truck driver and his employer after her husband was killed in a collision with the truck driver's tractor trailer. *Id.* at 124. The plaintiff called the truck driver defendant as an adverse party witness, and he testified that the decedent "was driving on the wrong side of the highway until immediately before the collision." *Id.* at 125. The jury entered a verdict in the plaintiff's favor. *Id.* at 124. However, this Court held that because the adverse party witness's testimony "was not contradicted by any of plaintiff's evidence, nor was it

8

incredible, illogical or unreasonable," the testimony was sufficient to prove the decedent's contributory negligence as a matter of law and justified reversing the jury's verdict. *Id.* at 125.[2]

When testimony of an adverse party witness is involved, a reviewing court does not look to the witness's credibility globally, as it would in an ordinary sufficiency of the evidence case. Rather, the adverse party witness rule requires a reviewing court to examine the testimony of a party called as a witness by the opposing party and to sift what is uncontradicted from what is contradicted (or inherently incredible). *See, e.g., Economopoulos*, 259 Va. at 812; *Nosay*, 193 Va. at 348-49; *see also* Sinclair, The Law of Evidence in Virginia § 15-40[c], 1183 (the rule applies "only to so much of the adverse witness's testimony as is *not contradicted by or in conflict with the calling party's other evidence*") (emphasis in original). If testimony from an adverse party witness is uncontradicted on a specific factual point, the plaintiff is bound by it. In addition, we have repeatedly rejected the notion that the "positive testimony" of an adverse party witness – specific factual testimony – can be overcome by other evidence, such as inferences drawn from primary facts, or "negative" testimony from a witness. *See Ragland v. Rutledge*, 234 Va. 216, 219 (1987) (inference that the truck was in the wrong lane "cannot serve to contradict the clear and reasonable testimony of the truck driver that the truck remained in its proper lane"); *Norfolk & Portsmouth Belt Line R.R. Co. v. C.F. Mueller Co.*, 197 Va. 533, 537-40 (1955) (the "negative evidence" from the plaintiffs' non-adverse witness was "insufficient to contradict the

---

[2] Although these cases did not involve the adverse party witness rule, we have held in several cases that the plaintiff's own evidence established an affirmative defense as a matter of law. *See Chesapeake & Ohio Ry. Co. v. Mizelle*, 136 Va. 237, 257 (1923) (holding that assumption of the risk was established by the plaintiff's own evidence and reversing the verdict for the plaintiff); *Piedmont Elec. Illuminating Co. v. Patteson*, 84 Va. 747, 768, 771 (1888) (holding that "from the plaintiff's own showing, the inference of contributory negligence by [the plaintiff] . . . is inevitable" and that thus "the verdict must be set aside").

positive testimony" of the plaintiffs' adverse witness, and the plaintiffs were bound by the adverse witness's testimony; consequently, the trial court "erred in submitting th[e] question of negligence to the jury").

II.    THE PLAINTIFFS' OWN EVIDENCE, INCLUDING TESTIMONY THE PLAINTIFFS ADDUCED FROM AN ADVERSE PARTY, ESTABLISHES DEFENSE OF ANOTHER AS A MATTER OF LAW.

"The tort of battery is an unwanted touching which is neither consented to, excused, nor justified." *Koffman v. Garnett*, 265 Va. 12, 16 (2003); *see also Parish v. Commonwealth*, 56 Va. App. 324, 330 (2010) (A battery is the "'wil[l]ful or unlawful touching' of another." (alteration in original) (quoting *Wood v. Commonwealth*, 149 Va. 401, 404 (1927))). However, not every touching is a battery. *Id.* "[A] touching is not a battery if it is 'justified or excused.'" *Id.* at 330-31 (quoting *Perkins v. Commonwealth*, 31 Va. App. 326, 330 (2000)).

Colas contends that he acted in defense of another. A number of settled legal principles of the law governing self-defense guide our review of his contention. The defense of others "is commensurate with self-defense." *Foster v. Commonwealth*, 13 Va. App. 380, 385 (1991). Whether the accused justifiably acted in defense of another is ordinarily a question of fact. *See Yarborough v. Commonwealth*, 217 Va. 971, 978-79 (1977). Nevertheless, undisputed facts may establish self-defense as a matter of law. *See Hines v. Commonwealth*, 292 Va. 674, 681 (2016); *Hensley v. Commonwealth*, 161 Va. 1033, 1036 (1933); *Smith v. Commonwealth*, 17 Va. App. 68, 69 (1993); *Foote v. Commonwealth*, 11 Va. App. 61, 69 (1990).

In Virginia, self-defense includes both subjective and objective components. The defendant "must have believed and must have had reasonable ground to believe, at the time [he acted], that he was in . . . danger." *Perkins v. Commonwealth*, 186 Va. 867, 877 (1947); *see also McGhee v. Commonwealth*, 219 Va. 560, 562 (1978) ("A defendant may always act upon

10

reasonable appearance of danger, and whether the danger is reasonably apparent is always to be determined from the viewpoint of the defendant at the time he acted.").[3]

Once the battery is established, the burden rests with the defendant to justify it "unless justification appears from the plaintiff's evidence." *Bourne v. Richardson*, 133 Va. 441, 463 (1922). Although defense of another is an affirmative defense, this defense operates in conjunction with the plaintiff's burden of proving that a touching is not justified or excused. *See Parish*, 56 Va. App. at 330. In other words, the plaintiff's evidence may negate the existence of a battery by showing the touching was justified or excused. Here, the jury was properly instructed on both aspects of battery. It was instructed that the plaintiff bore the burden of proving that the battery was without justification or excuse, and also that it was the defendant's burden to prove "by the greater weight of the evidence that he acted in defense of others." App. 764.

The estate observes that the credibility of witnesses is quintessentially a matter for the jury to resolve. We agree. A jury's verdict, however, must rest upon facts and reasonable inferences from these facts. If a jury's verdict "is plainly wrong or without evidence to support it," then it must be reversed. *Xspedius Mgmt. Co.*, 269 Va. at 424-25 (quoting *Stanley*, 260 Va. at 95).

---

[3] We note an important difference in how self-defense operates in a criminal trial as opposed to a civil trial. In a criminal prosecution, the burden of proving self-defense is on the defendant, but the defendant is only required to raise a reasonable doubt as to his guilt. *See Lynn v. Commonwealth*, 27 Va. App. 336, 352 (1998); *see also Hale v. Commonwealth*, 165 Va. 808, 814-15 (1936). In a civil case, self-defense, or defense of others, is an affirmative defense that the defendant must prove by a preponderance of the evidence. *See Young v. Warren*, 383 S.E.2d 381, 383 (N.C. Ct. App. 1989); *see also Norton v. Norton*, 335 So. 3d 371, 386 (La. Ct. App. 2021). In a civil battery case, as further noted below, that affirmative defense operates in conjunction with the requirement that a plaintiff must prove the battery was not justified.

In the present case, there can be no possible dispute over several key facts. Colas shot and killed Tyree. There is no disagreement as to that fact. It is likewise uncontested, both from the plaintiffs' and the defendant's witnesses, that Tyree was experiencing a protracted mental breakdown, and that he was angry and agitated – although the intensity of his emotion varied over the course of the more than two hours that he interacted with the police. It is undisputed that by his words and gestures he expressed suicidal ideation. He expressed veiled threats to the police, saying "I'm going to slit my throat and you guys are going to watch me bleed out or I'm going to charge at an officer and force you to shoot me." He also said he did not want to hurt the officers but indicated he would if they made him or if it was what he had to do. However, he did not advance on the police so long as they stayed out of the yard.

Colas, called by the defense as an adverse witness, testified that "[w]hen I fired the shot at [Tyree], it was to save Officer Tuft-Williams' life because he was holding this knife up in the air toward Officer Tuft-Williams and it looked like he was about to stab Officer Tuft-Williams." App. 132. The plaintiffs are bound by the testimony from this adverse party witness unless it is contradicted or inherently incredible or improbable. *Economopoulos*, 259 Va. at 812. Colas' testimony is not inherently incredible. Nor is it contradicted. To the contrary, the testimony from the other witnesses corroborated Colas' account.

Under settled law, "[t]he 'bare fear' of serious bodily injury, or even death, however well-grounded, will not justify the taking of human life." *Commonwealth v. Cary*, 271 Va. 87, 99 (2006) (quoting *Commonwealth v. Sands*, 262 Va. 724, 729 (2001)). "There must [also] be some overt act indicative of imminent danger at the time." *Vlastaris v. Commonwealth*, 164 Va. 647, 652 (1935). In the self-defense context, "'imminent danger' is defined as 'an immediate, real threat to one's safety.'" *Cary*, 271 Va. at 99 (quoting *Sands*, 262 Va. at 729). A mentally

disturbed person who seizes a knife, and lifts it in the air in very close proximity to the officer who just tackled this person, presents an obvious imminent danger.

It is also worth noting that the use of deadly force is justified if a defendant reasonably fears "death *or serious bodily harm.*" *McGhee*, 219 Va. at 562 (emphasis added); *see also Cary*, 271 Va. at 99 ("[T]he [overt] act must be of such a character as to afford a reasonable ground for believing there is a design to do some serious bodily harm, and imminent danger of carrying such design into immediate execution." (cleaned up) (quoting *Sands*, 262 Va. at 729)). All of the witnesses corroborated Colas' account that at the moment he was shot, Tyree had a military-style knife in his hand that was capable of inflicting serious bodily harm or even a mortal wound. It is also undisputed that Tyree's knife was raised in the air when Detective Colas took the fatal shot.[4]

Moreover, no evidence contradicts the testimony from all of the officers that after Tuft-Williams tackled Tyree and knocked him to the ground, the two were lying on the ground in very close proximity. Sergeant Bernstein testified that Tuft-Williams was "within arm's reach" of Tyree, and that he was in "imminent danger." Officer Ennis likewise testified that Tuft-Williams and Tyree were within "arm's reach of each other." Officer Beaton said the two "were in direct proximity of each other. . . . [I]t's almost like they were laying in bed next to each other facing the same direction."

In addition, the evidence, including a video recording from a body camera, shows unequivocally that less than two *seconds* elapsed between the tackle and Detective Colas taking

---

[4] Colas and Tuft-Williams thought the knife was beginning to move towards Tuft-Williams. Bernstein saw the knife being raised in the air in a sudden gesture but did not testify that it was being lowered towards Tuft-Williams. Under the standard of review, we review the evidence in the light most favorable to the prevailing party, and therefore we accept Bernstein's account as the one more favorable to the plaintiff.

13

the shot. While courts assessing the aftermath of a shooting have the luxury of deliberative hindsight, a police officer at the scene is required to make an immediate decision.

Taken together, the evidence establishes that an officer was on the ground, lying next to a profoundly disturbed and potentially dangerous individual, who then lifted a military-style knife in the air in such a way that the knife might be employed to stab the officer. Applying the adverse party witness rule, the evidence establishes that Detective Colas faced an immediate and possibly mortal danger to a fellow officer, and he was justified in taking a single shot in defense of his fellow officer.

The estate does not point us to any contrary testimony or evidence that would alter this evidentiary picture. Nothing in the body camera video contradicts Colas' account or that of the other officers. The estate's brief concedes that "[t]he video does not clearly and definitively show what occurred, nor does [a] 'still shot' [also contained] in the record." Appellee's Br. 32.

The estate did note at oral argument that Tuft-Williams had started to roll away from Tyree at the time the knife was raised. It suggests the shot may not have been justified on this basis. While the factual record does support the fact that Officer-Tuft Williams had started to roll away after the tackle, this does not alter the reasonableness of Colas' decision to fire a shot in these circumstances. Tuft-Williams was in very close proximity to Tyree, and Tyree had a knife raised in the air. In the immediacy of that moment, Colas was not required to wait and see whether Tyree might plunge the knife into Tuft-Williams' heart or neck, or whether something else might happen.

The estate has abandoned the assertion, made in the complaint, that Tyree was unarmed when he was shot. Instead, it intimates that Tyree did not raise the knife in a threatening gesture, but rather that he was shot while he was falling, after he was tackled by Officer Tuft-Williams.

14

Colas, the adverse party, was questioned about this by the estate, and he denied that Tyree was still in the process of falling when he raised the knife. The estate is bound by this testimony provided it "is uncontradicted and is not inherently improbable." *Economopoulos*, 259 Va. at 812. Detective Colas' testimony is not inherently incredible. The other officers, when questioned on that point, all agreed. So Colas' testimony was not contradicted on this point; it was reinforced. Sergeant Bernstein testified that Tyree's right arm was on or near the ground, that he had fallen completely to the ground, and *then* raised the knife in the air. Officer Beaton similarly testified that after he was tackled, Tyree had both arms on the ground and then made a sudden gesture with the knife. Officer Ennis's testimony was to similar effect. Officer Tuft-Williams also testified that Tyree raised the knife in the air. In short, no evidence contradicts Detective Colas' account that Tyree was shot after he fell, and that the shot was fired *after* Tyree raised a knife in the air.

In its brief, the estate extensively discusses Detective Colas' communications or miscommunications with Officer Tuft-Williams concerning the plan to neutralize Tyree with the SAGE device. Those facts were primarily relevant to the estate's gross negligence claim. The jury ruled in favor of the defense on that claim. Moreover, self-defense turns on the right to respond to an overt act that creates an "imminent danger." What was said and done before this imminent danger may be relevant background, but it is not dispositive on the question of self-defense. "The plea of self-defense is a plea of necessity and the necessity must be shown to exist or there must be shown such reasonable apprehension of the immediate danger, by some overt act, as to amount to the creation of necessity." *Vlastaris*, 164 Va. at 651. "The necessity to kill must affirmatively appear from the evidence adduced by the [defendant] unless the fact appears from the [plaintiff']s] own evidence or other circumstances in the case." *Thomason v.*

15

*Commonwealth*, 178 Va. 489, 498 (1941). Here, all the evidence, from the plaintiff and from the defense, established that Detective Colas faced an overt act that created an immediate danger.

This Court is frequently called upon to address the sufficiency of the evidence. In the run-of-the-mill cases, we apply long settled principles of law with respect to the credibility of witnesses. Here, the analysis differs from a run of the mill sufficiency case due to the application of a longstanding rule, the adverse party witness rule. Applying that rule here, as our precedent requires us to, compels us to reverse.

Every human being is a creature of eternal moment and infinite worth. Tyree's death constitutes an irreparable loss to his family and friends. Although the outcome was tragic, Detective Colas' decision to fire his weapon, on these specific facts, constituted defense of another as a matter of law. The plaintiffs adduced evidence from Detective Colas that he fired the shot in a moment of imminent danger to the life of another officer. Nothing in this testimony was inherently incredible, nor was it contradicted by other evidence. The circuit court, therefore, erred in declining to grant Detective Colas' motion to strike.

CONCLUSION

For the foregoing reasons, we will reverse the decision of the circuit court.

*Reversed and final judgment.*


JUSTICE RUSSELL, with whom CHIEF JUSTICE GOODWYN and JUSTICE MANN join, dissenting.

I agree with the majority that "[e]very human being is a creature of eternal moment and infinite worth[,]" that "Tyree's death constitutes an irreparable loss to his family and friends[,]" and that "the outcome was tragic[.]" *Supra*, p. 16. I also would agree with the majority's

16

ultimate conclusion and reverse the judgment below *if* the question before us was whether there was sufficient evidence to allow a rational factfinder to conclude that Colas fired the fatal shot under a reasonable belief that his actions were necessary to save the life of Tuft-Williams. Without question, the evidence at trial would permit a rational factfinder to reach such a conclusion.

That, however, is not the question before us. Rather, the question is whether the evidence adduced below required *every* rational factfinder to reach such a conclusion. When that question is considered in light of the evidence adduced, the appropriate standard of review, and the relevant burden of proof, it becomes clear that such a conclusion was not required as a matter of law. Accordingly, the trial court did not err in denying Colas' motion to strike or refusing to set aside the jury's verdict, and I respectfully dissent from the majority's conclusion to the contrary.

I.  Standard of review and deference to the jury

As the majority acknowledges, *supra*, p. 6, Colas faces a heavy burden in challenging the jury's verdict. "It is well-settled that 'a party who comes before us with a jury verdict approved by the circuit court 'occupies the most favored position known to the law.'" *Northern Va. Kitchen, Bath & Basement, Inc. v. Ellis*, 299 Va. 615, 622 (2021) (quoting *Ravenwood Towers, Inc. v. Woodyard,* 244 Va. 51, 57 (1992)). When, as here, a circuit court "has declined to strike the plaintiff's evidence or to set aside a jury verdict, the standard of appellate review . . . requires this Court to consider whether the evidence presented, taken in the light most favorable to the plaintiff, was sufficient to support the jury verdict" for the plaintiff. *Parson v. Miller*, 296 Va. 509, 523-24 (2018) (quoting *Bitar v. Rahman*, 272 Va. 130, 141 (2006)). Accordingly, "[w]e will not set aside a trial court's judgment sustaining a jury verdict unless it is 'plainly wrong or

17

without evidence to support it.'" *Fruiterman v. Granata*, 276 Va. 629, 637 (2008) (quoting Code § 8.01-680).

Put another way, it is not enough for Colas to convince us that, viewing the evidence in the proper light, some, many, or most rational factfinders (perhaps to include all seven members of this Court) would conclude that Colas fired the fatal shot under a reasonable belief that his actions were necessary to save the life of Tuft-Williams. Rather, he must demonstrate that *no* rational factfinder could have concluded otherwise.

This high degree of deference to the jury stems not only from the fact that we are reviewing a decision already made, but also because we recognize that the jurors are in a superior position to make the decision in the first instance. They are entitled to such deference because their decisions are made on the basis of "[t]he living record[, which] contains many guideposts to the truth which are not in the printed record; not having seen [the witnesses] ourselves, we should give great weight to the conclusions of those who have seen and heard them." *Dean v. Morris*, 287 Va. 531, 536-37 (2014) (quoting *Fred C. Walker Agency, Inc. v. Lucas,* 215 Va. 535, 541 (1975)). In general, jurors "are the sole judges of the weight and credibility of the evidence and have the right to discard or accept the testimony, or any part thereof, of any witness when considered in connection with the whole evidence before them."[1] *Gilliam v. Immel*, 293 Va. 18, 24 (2017) (quoting *Smith v. Wright*, 207 Va. 482, 486 (1966)). Our deference to a jury's credibility determinations nearly is absolute because "[w]hen the law says that it is for the jury to judge of the credibility of a witness, it is not a matter of degree."

---

[1] The adverse witness rule is an exception to this general rule and is discussed in detail in Section V, *infra*.

*Sidya v. World Telecom Exch. Commc'ns, LLC*, 301 Va. 31, 37 (2022) (quoting *Simpson v. Commonwealth*, 199 Va. 549, 557 (1957)).

This deference is not limited to a jury's determinations tied to testimony and witness credibility but, rather, applies to all of the evidence, including video evidence. Even though we are able to observe video evidence much as the jury did, our purpose in reviewing that evidence is different. A jury, sitting as factfinder, "views video and other evidence to determine what it believes happened"; an appellate court "view[s] video evidence not to determine what we think happened, but for the limited purpose of determining whether any rational factfinder could have viewed it as the [jury] did." *Meade v. Commonwealth*, 74 Va. App. 796, 806 (2022).

## II. Colas bore the burden of proof on the pertinent issue

Adding to Colas' daunting task is the fact that, in the trial court, he bore the burden of proof on the issue pertinent to this appeal—whether firing the fatal shot was a permissible exercise of the defense of others. As the majority notes, the defense of others is "an affirmative defense," *supra*, p. 11, and the trial court correctly instructed the jury that "[t]he burden is on [Colas] to prove defense of others."

The burden assigned to Colas on this issue included both the burden of production *and* the burden of persuasion. As we previously have observed,

> "The phrase 'burden of proof' refers to two related but distinct concepts: (1) The 'burden of production,' which is the obligation to come forward with evidence to make a *prima facie* case . . . , and (2) the 'burden of persuasion,' *which is the obligation to introduce evidence that actually persuades the fact finder to the requisite degree of belief that a particular proposition of fact is true*."

*Suntrust Bank v. PS Bus. Parks, L.P.*, 292 Va. 644, 652 (2016) (emphasis added) (quoting Charles E. Friend & Kent Sinclair, The Law of Evidence in Virginia § 5-1[a], at 298 (7th ed. 2012)).

As the majority's recitation of the evidence demonstrates, there is no question that the evidence satisfied Colas' burden of production.[2] There was more than sufficient evidence to allow a rational juror to conclude that Colas reasonably was engaged in the defense of others when he fired the fatal shot. In fact, at oral argument in this Court, the estate conceded as much (Oral Argument rec. 19:50-20:15).

Recognizing that the evidence was sufficient to *allow* a rational juror to reach such a conclusion, however, is not the same thing as concluding that the evidence *required* a rational juror to reach that conclusion. Colas had to convince the jury. As noted above, the jury was, as a general proposition, free to disbelieve Colas' evidence, having "the right to discard or accept the testimony, or any part thereof, of any witness when considered in connection with the whole evidence before them."[3] *Gilliam*, 293 Va. at 24 (quoting *Smith*, 207 Va. at 486).

In its discussion of the burden of proof, the majority notes that, in the ordinary battery action, a plaintiff bears the "burden of proving that a touching is not justified or excused." *Supra*, p. 11. The majority also notes the generic rule that a defendant's burden to prove an affirmative defense such as the defense of others only arises "[o]nce the battery is established[.]" *Supra*, p. 11. While correct statements of hornbook tort law, these statements have little application in this case given how Colas presented his case to the jury and a concession he made in closing argument.

---

[2] The recognition that Colas bore the burden of both production and persuasion on the affirmative defense does not, in any way, suggest that he could not carry that burden by relying on evidence adduced in the estate's case. I agree with the majority that an affirmative defense can be established in plaintiff's case in chief if the evidence adduced so warrants. *Supra*, p. 11. I disagree that, as a matter of law, the evidence in the estate's case in chief did so in this case.

[3] As noted above, the adverse witness rule is a limited exception to the general rule and is discussed in detail in Section V, *infra*.

Colas conceded below that he committed a battery and only could avoid liability if the jury accepted that he committed it in the defense of others. Specifically, in his closing argument to the jury, Colas admitted committing battery, telling the jury: "Let's move to battery. *A battery occurred. Detective Colas shot Jeffrey Tyree*. We've covered it in detail already. He was trying to save the life of Officer Tuft-Williams. The affirmative defense of others is appropriate in this case[.]" (Emphasis added). Having conceded that he committed a battery and could prevail if the jury accepted that he acted in defense of others, Colas effectively removed the issue of whether a battery occurred from the jury's consideration below and our consideration on appeal.[4] Accordingly, the only issue on appeal is whether, when the evidence is viewed under the proper standard, Colas was entitled to use deadly force as a matter of law.

### III. Elements of defense of others

The majority correctly notes that the ability of a defendant to claim the protections provided by the doctrine of the defense of others is coterminous with a defendant's ability to claim the protections of self-defense. *Supra*, p. 10. The majority also correctly notes that "[w]hether [Colas] acted in defense of another is . . . a question of fact" and that question "includes both subjective and objective components." *Supra*, p. 10. To be privileged to use

---

[4] It matters not whether the concession is considered one of fact, which would bind us, *Cofield v. Nuckles*, 239 Va. 186, 194 (1990), or a concession of law, which would not. *Alexander v. Cobb*, 298 Va. 380, 388 (2020). Even if Colas conceding to the jury that he, in fact, committed a battery is characterized as a non-binding concession of law, the concession waived any appellate argument Colas may have had that was premised on him not having committed a battery. *See* Rule 5:25; *Logan v. Commonwealth*, 47 Va. App. 168, 172 n.4 (2005) (en banc) (recognizing that the principle that a party's concession of law is not binding on an appellate court "must be distinguished, however, from an appellant's concession of law that qualifies either as a waiver for purposes of [the contemporaneous objection rule] or as an express withdrawal of an appellate challenge to a trial court judgment. In either scenario, we may accept the concession—not as a basis for deciding the contested issue of law, but as a basis for not deciding it").

21

deadly force in defense of another, a defendant "must reasonably fear [the] death [of] or serious bodily harm" to the person he seeks to defend. *McGhee v. Commonwealth*, 219 Va. 560, 562 (1978); *see also Caison v. Commonwealth*, 52 Va. App. 423, 440 (2008) (recognizing that for a defendant successfully to claim self-defense, the "amount of force used must be reasonable in relation to the harm threatened") (citation omitted); *Couture v. Commonwealth*, 51 Va. App. 239, 250 (2008) (recognizing that a police officer is "entitled to use deadly force to protect himself . . . , but only if the 'amount of force' was not excessive and was 'reasonable in relation to the perceived threat'").

That a person may represent an imminent harm and immediate threat at one point in a confrontation does not require the conclusion that he or she retains that status throughout an encounter. *See Avent v. Commonwealth*, 279 Va. 175, 202 (2010). Even if reasonable, a generalized fear of potential harm due to actions occurring in the past is insufficient, *Commonwealth v. Sands*, 262 Va. 724, 730 (2001); rather, a "defendant must . . . show that [the person he seeks to defend] was in *imminent* danger of harm, that is, a showing of an overt act or other circumstance that affords an *immediate* threat to safety." *Hines v. Commonwealth*, 292 Va. 674, 679 (2016) (emphases added).

Thus, to prevail on his claim of defense of another, Colas first had to convince the jury that, subjectively, he believed that Tyree posed an imminent and immediate lethal threat to Tuft-Williams when Colas fired the fatal shot. Then, he had to convince the jury that such a belief was reasonable under all of the facts and circumstances.

### IV. Evidence calling Colas' actions into question

Ultimately, answering the question of whether Tyree posed a sufficient threat to Tuft-Williams to justify Colas' use of deadly force largely turns on the few seconds surrounding the

22

fatal shot. However, the majority correctly notes that the hours leading up to the fatal shot reasonably could color the responding officers' perceptions. Similarly, the facts about that time period and other facts about Tyree's condition reasonably could color a juror's view of Colas' actions and beliefs.

The majority focuses on certain facts—that Tyree possessed a knife, that he "was experiencing a protracted mental breakdown, [] that he was angry and agitated[,]" and that he had expressed "suicidal ideation"—as demonstrating that he posed a lethal threat to Tuft-Williams. This recitation leaves out a few facts that certainly would be fodder for the jury's consideration.

Although Tyree did express suicidal ideation and did possess a knife during this period, multiple witnesses testified that Tyree stated he did not intend to hurt the officers. One of the officers present, Officer Murray, testified that he was not aware of Tyree threatening to harm anyone other than himself. Furthermore, Officer Beaton, who was the first officer on scene, testified that, in the two and a half hours prior to the shooting, Tyree did not threaten officers directly and specifically stated that he "didn't want to hurt any officers." A rational juror was entitled to consider this when determining whether it was reasonable for Colas to conclude that Tyree posed a lethal threat to Tuft-Williams.[5]

---

[5] It is true that Beaton also attributed other statements to Tyree that might suggest he posed more of a threat. The jurors, however, were under no obligation to accept those portions of Beaton's testimony. With the limited exception of a portion of Colas' testimony discussed in Section V *infra*, the jurors were not obligated to accept as true testimony that was beneficial to Colas' claimed defense. Rather, as "the sole judges of the weight and credibility of the evidence[,]" the jurors had "the right to discard or accept the testimony, or any part thereof, of any witness when considered in connection with the whole evidence before them." *Gilliam*, 293 Va. at 24 (quoting *Smith*, 207 Va. at 486).

23

Furthermore, it is important to remember that in addition to Tyree suffering from what the majority characterizes as "a protracted mental breakdown[,]" Tyree was fifty-seven years old and suffered from physical disability that caused him to use a cane or walker to get around. Both the video evidence and the testimony established that his movements were not those of a physically vigorous person, with one police witness characterizing Tyree's movements as "shuffling or stuttering[.]" This contrasts with Tuft-Williams, who was younger, an active member of the police force, and who, from the video evidence, did not suffer from a physical disability sufficient to impair his movements. Certainly, Tuft-Williams' movements at the time of the tackle and immediately afterwards would not be characterized as "shuffling or stuttering." A rational juror was entitled to consider the contrast in the physical condition of these two individuals in determining whether it was reasonable for Colas to conclude that Tyree posed a lethal threat to Tuft-Williams, even if Tyree fell in close proximity to Tuft-Williams after Tuft-Williams tackled Tyree by surprise.

Turning to the effect of the tackle, a juror could conclude that Tuft-Williams forcefully taking Tyree to the ground would limit Tyree's ability to respond immediately in an aggressive manner. Although it is uncontested that Tuft-Williams was able to immediately begin rolling away from Tyree after the tackle and was able in a second or two to get to his feet, it does not follow that the fifty-seven-year-old disabled man who normally required a cane or walker to get around would be able to respond as quickly.[6] Thus, even though the evidence established that Tyree did possess a knife and held it aloft after the tackle, it did not definitively establish that he

---

[6] According to Tuft-Williams, he began rolling away from Tyree before Colas fired the shot.

24

was even physically capable of swinging the knife at Tuft-Williams quickly enough to pose an immediate and lethal threat.

One reason that the evidence does not establish that Tyree was physically capable of quickly swinging the knife at Tuft-Williams in a life-threatening manner is that the evidence does not establish that Tyree ever swung the knife at Tuft-Williams. Viewed under the appropriate standard, the video, photographic, and testimonial evidence established that Tyree possessed the knife and held it aloft after being tackled by surprise, but nothing more. As the majority concedes, no evidence that the jury was required to accept established that the knife was ever directed towards Tuft-Williams.

Finally, in evaluating whether Colas' actions were reasonable, a rational juror could consider the actions of the other officers on the scene. Despite ten to fifteen officers being present, only one officer, Colas, drew a firearm and fired it at Tyree as a result of the events. None of the other officers at the scene reacted in the same manner, giving rise to a reasonable inference that they did not view the potential danger Tyree posed to Tuft-Williams in the same way. Although the fact that none of the other officers at the scene drew his gun and fired at Tyree is not dispositive of whether Colas' actions and beliefs were reasonable, it certainly is a piece of evidence that a reasonable juror could consider.

Taking all of this evidence together, the question is whether a rational juror necessarily would believe that a physically disabled fifty-seven-year-old man, who normally needed a cane or walker to get around, who had stated that he did not intend to harm the officers, and who just had been violently tackled to the ground without warning by a younger, more vigorous man who was able to and did begin moving away immediately, posed an immediate and imminent threat to Tuft-Williams because he continued to possess a knife he held before he was tackled. A rational

25

juror certainly could have so concluded, and thus conclude that Colas' belief was reasonable.  In fact, it certainly is possible that many or most rational factfinders would have reached that conclusion.  However, viewing the evidence in the light most favorable to the estate and properly assigning the burden of proof to Colas, a juror would not be required to so find.  Thus, unless some rule alters this straightforward, ordinary appellate review, the trial court did not err.

### V.  The adverse witness rule does not entitle Colas to a reversal

Both Colas and the majority assert that the adverse witness rule is a rule that, in effect, alters ordinary appellate review of this case and requires that we reverse the judgment below.  For the following reasons, I disagree.

Properly understood, the adverse witness rule is a *limited* exception to the general principle that jurors are free to believe or disbelieve the testimony of a witness.  As the majority notes, because the estate "called [Colas] as a witness[,]" it was "bound by his testimony" absent an exception to the adverse witness rule.  *Supra*, p. 7.

The majority notes that the estate would not be bound by any testimony of Colas that was contradicted by other evidence or that was inherently improbable.  *Supra*, p. 7.  We have noted other exceptions to the rule, noting that "[i]n addition to being uncontradicted, to be binding" adverse witness "testimony must be 'clear,' 'reasonable,' 'logical,' and 'not incredible.'"  Kent Sinclair, The Law of Evidence in Virginia § 15-40[c], 1183 (8th ed. 2018) (footnotes and citations omitted).

In its analysis, the majority focuses on Colas' conclusion that Tuft-Williams' life was in danger.  It then compares Colas' conclusion to the testimony of other officers who reached

similar conclusions.[7]  Given the similarity in the conclusions reached, the majority opines that Colas' conclusion was uncontradicted, and that the estate is somehow bound by Colas' conclusion, and that the jury was required, as a matter of law, to accept that Colas' conclusion was reasonable.

In doing so, the majority has conducted its analysis of the adverse witness rule at too high a level of abstraction.  Although there was similarity in the ultimate conclusions reached by multiple officers on scene, there were contradictions in the evidence as to the factual bases for those conclusions.  Thus, a jury was not bound to accept Colas' conclusions.  Critically, Colas claimed to have taken the fatal shot because after the tackle, Tyree still possessed the knife which he held before he was tackled, and "the knife was moving in a direction towards Officer Tuft-Williams."  Thus, central to Colas' claimed conclusion that Tuft-Williams' life was in jeopardy was his claim that Tyree was moving the knife toward Tuft-Williams when Colas fired.

This underlying factual claim was contradicted by testimony and other evidence.  Specifically, as the majority acknowledges, there was evidence that—at the time Colas fired the fatal shot—the knife was not being swung at Tuft-Williams, but rather, that Tyree was holding the knife straight up in the air.  Accepting that as true, it contradicts Colas' testimony not about an inconsequential detail, but about the primary factual basis for his claimed belief that Tuft-Williams was in mortal danger.  Because the evidence was in conflict on this point, the jury was

---

[7] It is important to note that the jury was not bound, by the adverse witness rule or otherwise, to credit the testimony of the other officers that is referenced by the majority.  At the time the jury was instructed that it was bound by the testimony of the defendant called as an adverse witness, Colas was the sole defendant.  Accordingly, as factfinder, the jury was free to either believe or disbelieve the testimony, conclusory or otherwise, of the remaining officers referenced by the majority.

entitled to disbelieve Colas' statement that Tyree moved the knife towards Tuft-Williams.[8]

Given that the jury was free to reject the factual basis Colas offered for his conclusion, it also was free to disregard his resulting conclusion that Tuft-Williams' life was in danger and that the shooting of Tyree was reasonable under the circumstances.

Even if one were to accept that the adverse witness rule required the jury to accept that Colas possessed the subjective belief that Tuft-Williams' life was in danger, that was only part of what Colas had to prove. He also had to prove that such a belief was reasonable. The fact that he testified he believed it does not compel the conclusion that the belief was reasonable. The jury was required to judge the reasonableness of that belief against all of the evidence, including Tyree's age, his physical infirmity, Tuft-Williams' age and physical condition, Tyree's statements that he did not intend to harm the officers, the surprise nature of the tackle, and much more. Certainly, the majority points to no testimony of Colas that definitively answers the reasonableness question. Accordingly, even if the jury were bound by all of Colas' testimony, the jury was still free to find that his professed belief, though actually held, was not reasonable under all of the facts and circumstances.

A conclusion that the adverse witness rule did not compel a finding that Colas acted in defense of others is fatal to his claim on appeal. Absent such compulsion, the evidence presented

---

[8] This is not the only portion of Colas' testimony regarding Tyree's potential dangerousness that was contradicted by other evidence. For example, Colas testified that he believed Tyree represented a threat to officers throughout the two-and-a-half-hour encounter. Specifically, he testified multiple times that Tyree posed a threat because, carrying the knife, he could quickly scale or vault over the chain-link fence, which was approximately four feet high, and then injure an officer. This testimony was contradicted by the testimony of other officers who did not perceive Tyree as a threat during this period and by the evidence establishing Tyree's limited mobility and that he normally required a cane or walker to get around. Given these contradictions, the jury could reject the notion that Tyree had the ability to scale the fence to pose a threat to officers and Colas' assessment of Tyree's level of dangerousness throughout the encounter even though Colas testified as an adverse witness.

28

created a question of fact—whether Colas fired the fatal shot under a reasonable belief that his actions were necessary to save the life of Tuft-Williams. Such factual questions belong to the jury, and neither a trial court nor this Court is permitted to invade the province of the jury to substitute its judgment for that of the jury. Because the evidence below was sufficient to raise a jury question, the trial court did not err in denying Colas' motion to strike, and I dissent from the majority's conclusion to the contrary.

## VI. Conclusion

It is often said that hard cases make bad law. This case definitely is a hard case. As noted above, it very well may be that most rational factfinders reviewing the evidence would conclude that Colas believed Tuft-Williams was in mortal danger when Colas fired the fatal shot and that such a belief was a reasonable one given all of the facts and circumstances. Accepting that as true, however, does not entitle him to a reversal of the jury's verdict. For the reasons stated above, I believe that, viewing the evidence in the light most favorable to the estate, a rational factfinder could conclude that Colas failed to prove his claimed affirmative defense. As a result, the trial court did not err in denying Colas' motion to strike. Accordingly, I would affirm the judgment of the trial court, and thus, respectfully dissent.